STATE OF NEW JERSEY, DEFENDANT IN ERROR, v. JOHN P. LYNCH, PLAINTIFF IN ERROR.

Argued February 2, 1943—Decided May 13, 1943.

For the plaintiff in error, *William C. Gotshalk.*

For the state, *Joseph Lanigan,* Assistant Attorney-General (*Anthony C. Mitchell,* of counsel).

The opinion of the court was delivered by

HEHER, J. Plaintiff in error was convicted of murder in the first degree, and was sentenced to death. He sued out a writ of error; and the entire record of the proceedings had upon the trial of the cause was returned with the bill of exceptions, pursuant to *R. S.* 2:195-16.

The victim, George O. Miller, was a police officer of the Borough of Clementon. The accused was a justice of the peace resident in a town nearby. For some time prior to the killing, he had had a meretricious relationship with a woman named Mitchell, a resident of Clementon. They quarreled frequently. Financial transactions between them led to a law suit. On Christmas Eve of 1941, the accused was arrested on a complaint made by his paramour charging that he had threatened to kill her and her sister. There was a reconciliation the following New Year's Eve, and the complaint was withdrawn. In mid-January, the woman made another complaint, alleging the same offense; and the accused was arrested and held in bail for the grand jury. He was in due course indicted on this charge. The indictment was pending when the killing occurred. The accused made repeated efforts to effect a reconciliation. Immediately after his arrest on the last complaint, he journeyed to Clementon for that purpose, and was again arrested on a charge of permitting an unlicensed person to operate his automobile. The deceased played some part in these proceedings, but there is nothing to show that ill feeling was thereby engendered. The accused was also indicted for malfeasance in his office as justice of the peace; and the contention was made at the trial that these and other difficulties had been productive of incessant worry, which in turn led to the excessive use of bromides. A day or two before May 18th, 1942, the accused again visited Mrs. Mitchell in an effort to compose their differences. At her instance, however, he was taken into custody by the local police, but no offense was charged and he was released shortly. On the 18th he called at her residence to deliver furniture belonging to her. Her sister invited him into the house, and the result was a resumption of friendly relations with Mrs. Mitchell. The accused testified that, at her invitation, he visited her house on May 20th. He said that their relations were then amicable, but Mrs. Mitchell denied this. At all events, the accused left the house to procure a glass of bromo seltzer, and when he returned he found the deceased police officer awaiting him.

The officer informed him that it was Mrs. Mitchell's wish that he leave the house, and he agreed to do so. The officer drove him in his automobile to the borough line, where the accused went on his way. Shortly after midnight, Mrs. Mitchell discovered the accused in the vicinity of her house, and her brother-in-law, one Whitmore, went in search of a police officer and returned with the deceased. As they reached the house, there was a burst of gunfire from the opposite side of the road. Three bullets entered the body of the police officer, one proving fatal. A bullet struck Whitmore in the shoulder. No one witnessed the firing of the shots. Two hours later, police officers found the accused in the cellar of the Mitchell home, "sitting against the chimney on the floor," with a fully loaded 22-calibre rifle and a fully loaded revolver in his possession. It is contended that he was then in a "stupefied condition." There was evidence that the fatal bullet was discharged from the rifle, and that the accused admitted that he had "killed" the deceased. The defense was that, at the time of the shooting, the accused "had a total amnesia," and was insane and not aware of what had happened. Evidence was adduced that for two or three years immediately preceding the killing, he had suffered from chronic bromide poisoning, and that this condition became acute prior to the shooting as a result of the taking of a large quantity of bromides. This defense was supported by medical testimony. The case was submitted to the jury on the theory that, to warrant a conviction of murder in the first degree, it was essential that the evidence establish a willful, deliberate and premeditated killing.

Error is assigned upon the following instruction to the jury: "Whenever there is, in committing a homicide, a specific intention to take life, there is, in the language of the statute, a willful, deliberate and premeditated killing, and the offense is murder in the first degree." The assignment is well-founded.

By this instruction, the requisite elements of deliberation and premeditation were utterly ignored. Thereby, proof of a willful killing warranted the jury in returning a verdict of

guilty of murder in .the first degree. Under this definition, a "specific intention to take life," without more, connotes deliberation and premeditation within the intendment of the statute. This is plainly erroneous. *State* v. *Bonofiglio,* 67 *N. J. L.* 239; *State* v. *Zdanowicz,* 69 *Id.* 619; *State* v. *Deliso,* 75 *Id.* 808; *State* v. *Mangano,* 77 *Id.* 544.

It is futile to search for a corrective in other passages in the charge. The trial judge evidently misapprehended the law, and laid down for the guidance of the jury a doctrine that received the unqualified condemnation of this court in *State* v. *Bonofiglio, supra,* and has since been consistently rejected as a perversion of the statutory purpose. He refused to charge requests that embodied the correct principle. The definitions of "deliberation" and "premeditation" were nullified by the direction that in statutory contemplation these elements are *ex necessitate* the concomitants of "a specific intention to take life." Even where the pertinent rule is accurately stated in other sections of the charge, the erroneous instruction must be explicitly withdrawn, for the jury has not the faculty to distinguish between sound and erroneous directions in matters of law.

There was prejudicial error also in the trial judge's treatment of a request to charge. The accused presented the following request: "26. Although the state must prove the guilt of the defendant beyond a reasonable doubt, it is sufficient if the defendant establishes his insanity to the jury by a clear preponderance of the proof only and if he has done so you should acquit him and your verdict should be that of not guilty." The trial judge disposed of the request thus: "I have charged as requested by the twenty-sixth request, but I will repeat it: * * *." After restating the particular request *verbatim,* the judge made this observation: "Wait a minute that is not strictly so. The idea is that the defendant does not have upon him the same burden of proof that the state has. Is that what you want? Mr. Gotshalk: Yes."

This comment evinces a misconception of the law respecting the burden of proof of insanity when interposed as a defense to an indictment for murder. Sanity is presumed;

and the burden rests upon the defendant to establish insanity to the satisfaction of the jury, and it may be established by the preponderance of proof. *Graves* v. *State*, 45 *N. J. L.* 347; *State* v. *Overton*, 85 *Id.* 287. But whatever the view entertained by the trial judge, what he said plainly tended to confuse the jury as to which rule governed.

And the trial judge likewise seems to have misconceived the law respecting the quality and the degree of mental impairment requisite to constitute the defense of insanity. Certainly, he was not apt in his choice of language to convey the legal concept of insanity. He instructed the jury as follows: "Finally, many of the forms and degrees of mental disease, which, in the judgment of learned men, would be regarded as insanity, are utterly rejected by the law in the administration of criminal justice. The law regards insanity as a disease of the mind, implying fixedness and continuance of mental condition. It therefore rejects the doctrine of what is called emotional insanity, which begins on the eve of the criminal act and ends when it is consummated." He refused to charge a request that insanity at the time of the commission of the asserted criminal act was a defense, whether it "be of a temporary or permanent character." Thus it is evident that the judge did not deem "temporary" insanity a legal defense, no matter what its effect upon the mind of the accused at the time of the commission of the lethal act.

If, at the time of the shooting, the accused, by reason of temporary insanity, was incapable of distinguishing between right and wrong with respect to the act, he is not guilty of murder. Unless he was conscious that it was an act which he ought not to do, there was a lack of moral or criminal responsibility. *State* v. *Aeschbach*, 107 *N. J. L.* 433. By the same token, neither "emotional insanity" nor "irresistible impulse" is a defense if thereby the actor is not deprived of the faculty of discerning and appreciating the moral quality of the act, *i. e.*, an awareness of the difference between right and wrong and his legal and moral duty with respect to the act. *State* v. *Spencer*, 21 *Id.* 196; *Genz* v. *State*, 59 *Id.* 488; *Mackin* v. *State*, 59 *Id.* 495; *State* v. *Carrigan*,

93 *Id.* 268; *affirmed,* 94 *Id.* 566; *State* v. *James,* 96 *Id.* 132; *State* v. *Noel,* 102 *Id.* 659.

In this view, we have no occasion to determine the validity of the other assignments of error and specification of causes for reversal.

The judgment is accordingly reversed, and a *venire de novo* awarded.

*For affirmance*—None.

*For reversal*—The Chief Justice, Parker, Case, Bo-dine, Donges, Heher, Perskie, Porter, Dear, Wells, Rafferty, Hague, Thompson, JJ. 13.