STATE OF NEW JERSEY, PLAINTIFF-APPELLANT AND CROSS-RESPONDENT, v. THEODORE MOLNAR, DEFENDANT-RESPONDENT AND CROSS-APPELLANT.

Argued October 10, 1979—Decided January 10, 1980.

476

*Mr. Robert E. Rochford,* Deputy Attorney General, argued the cause for appellant (*Mr. John J. Degnan,* Attorney General of New Jersey, attorney).

*Mr. Michael J. Herbert,* Designated Counsel, argued the cause for respondent (*Mr. Stanley C. Van Ness,* Public Defender, attorney).

The opinion of the court was delivered by

PASHMAN, J.

This appeal presents issues relating to the defenses of entrapment and amnesia. Defendant Theodore Molnar was convicted of misconduct in office, *N.J.S.A.* 2A:85–1, and two counts of perjury, *N.J.S.A.* 2A:131–1. A divided Appellate Division ordered a new trial because of the court's instruction placing the burden of persuasion as to amnesia on defendant. *State v. Molnar,* 161 *N.J.Super.* 424 (App.Div.1978). The State appeals that ruling. Defendant cross-appeals, asserting as additional error the trial court's refusal to submit the issue of entrapment to the jury or to hold that entrapment existed as a matter of law. In resolving these questions, we must consider the applica-

tion of the recently enacted New Jersey Code of Criminal Justice (Code), *N.J.S.A.* 2C:1–1 *et seq.,* to a case pending on direct review after the Code's effective date. *See N.J.S.A.* 2C:1–1(b), (c); *N.J.S.A.* 2C:98–4.

I

The charges against defendant allege that while serving as Acting Warden of the Mercer County Workhouse, he failed to report and on two separate occasions denied under oath knowledge of a bribery scheme at the facility. The scheme involved the attempt of an inmate, Angelo ("Doc") Migliaccio, to obtain a more agreeable work assignment. Incarcerated since February 1973 under a 12-month sentence for gambling convictions, Migliaccio had lost a favorable "outside" assignment in the facility's hothouse by violating workhouse regulations. His new job entailed custodial duties indoors and was more burdensome. Wishing to avoid the additional labor and concerned about his precarious health, Migliaccio sought to regain his old position in early June 1973. A friend and fellow inmate, Richard Storcella, promised his help in exchange for $1,500.

Storcella's work assignment in the administration building gave him access to the warden's office. There he approached defendant and remarked casually that Migliaccio would pay $1,000 for favorable treatment. Molnar rejected the suggestion of a bribe. He stated that he was not inte. ced in money and would do whatever was in Migliaccio's best interest as an inmate. Storcella never discussed the matter with Molnar again.

Dissatisfied with this response, Storcella enlisted the aid of Michael Loffredo, a guard at the workhouse and a friend of Molnar. Storcella promised the guard $700 for his assistance. Loffredo then spoke with defendant on behalf of Migliaccio, referring to the inmate's poor health and asking for the reassignment as a personal favor. Molnar agreed to help. A few days later, on June 12, 1973, Migliaccio was returned to his

"outside" work detail. Loffredo received $700 through Storcella's wife, and Storcella retained the balance of Migliaccio's $1,500 payment.

Two days after Migliaccio's reassignment, Molnar was hospitalized for thrombophlebitis. On July 1, 1973, while defendant was convalescing in Florida, Migliaccio walked off the workhouse grounds and escaped. Molnar returned to New Jersey in early July. Later that summer he met Loffredo in a Trenton bar. They discussed various personal matters, including Molnar's financial problems. At the conclusion of the conversation, Loffredo followed Molnar to the men's room and offered him money. After Molnar rejected it, Loffredo stuffed a $100 bill in Molnar's pocket. Both men testified at trial that the money was in repayment of an $80 debt.

After his escape, Migliaccio began to suspect that Storcella had duped him in the use of the $1,500. While still at large, he contacted the Mercer County Prosecutor's office and informed an investigator of the bribery plot. Migliaccio eventually agreed to assist that office in an investigation of corruption at the workhouse. In return, the prosecutor's office allowed him to remain free during the investigation, and later recommended a reduction of his gambling sentences and no custodial sentence on a pending charge of escape. Migliaccio was resentenced to time already served and was fined for his escape.

At the direction of the prosecutor's office, Migliaccio and his wife engaged Storcella, Mrs. Storcella and Loffredo in telephone conversations which investigators recorded secretly. During a conversation on November 20, 1973, Mrs. Migliaccio told Loffredo that her husband would surrender if the punishment for his escape would not be solitary confinement. Loffredo informed defendant of Migliaccio's offer, and the next day arranged a telephone conversation between Molnar and the escapee.

Pursuant to this arrangement, on November 21, 1973 Migliaccio called defendant from the home of a Mercer County investigator. Having suffered head and other injuries in an automo-

bile accident about two weeks earlier, Molnar was home on sick leave at the time. The conversation was recorded. As agreed, Migliaccio identified himself by asking "Ted" (the defendant) for "Mike." This was presumably a reference to Loffredo, for Molnar replied that he was not present but had called earlier. After inquiring about defendant's health, Migliaccio stated obliquely that he had given $1,500 to "Storky" (Storcella) and that Loffredo had received $500. Molnar did not express any understanding of his caller's cryptic references to payments. When the escapee asked Molnar directly whether he got his "right amount * * * [t]he thousand," he initially replied "No. I didn't get a thing." Defendant then remarked that he had received $100 from Loffredo, but was unaware that the guard had given the money for illicit purposes. After Migliaccio outlined more clearly the payments made to "Storky" and "Mike," defendant again denied any knowledge of a scheme. The rest of the dialogue consisted of entreaties by Migliaccio and assurances by defendant that the escapee would suffer no reprisals upon his return to the workhouse.[1]

While his comments were often vague and rambling, Migliaccio did make clear to defendant that Loffredo had received a $500 bribe. A later recorded conversation between Migliaccio and Loffredo indicates that defendant did not know of the scheme when he received the $100 from his friend in the Trenton bar. The undisputed inference is that Molnar first learned of bribery at the workhouse when he spoke with Migliaccio on November 21. His defenses in this case rest largely upon the State's role in arranging that conversation and his later failure to recall it due to traumatic amnesia following his accident.

Approximately two months after Molnar's recorded conversation, a county investigator interviewed him at the warden's

---

[1]Portions of the transcript of this conversation are set forth in the Appellate Division opinion at 161 *N.J.Super.* 435–437.

office. While the investigator surreptitiously recorded the conversation, they discussed the escapes of a recently apprehended inmate and Migliaccio, who ostensibly was still at large. At one point, Molnar acknowledged hearing a rumor that Migliaccio was in the Trenton area, but denied any personal contact with his former prisoner. When asked directly, Molnar stated that he had not received a bribe, and that he knew of no one at the workhouse who had accepted tainted money. The investigator then stated that word of a bribe was "on the street." Molnar replied, "Well, then, now I know, see what I had heard was not idle gossip. It is * * * a fact or somebody is spreading a rumor * * *."

On January 30, 1974, the Mercer County Grand Jury called Molnar to testify regarding possible improper conduct by workhouse officers. He was warned when he entered the grand jury room that he was a target of the investigation. Under oath, defendant recalled the rumor of bribery related to him by the investigator and a workhouse guard; however, he disclaimed knowledge of payments by Migliaccio for a reassignment or by any inmate for any purpose. Molnar specifically denied that he had received a bribe or any proceeds himself and stated that he had not spoken with Migliaccio at any time after the inmate's escape.

The grand jury recalled defendant on February 6, 1974. He again denied having talked with Migliaccio after his escape. Later that day, the grand jury indicted Molnar for perjury in making that statement. On March 27, the grand jury issued a five-count indictment charging defendant with conspiracy, unlawful taking of money by a public official, bribery and two counts of misconduct in office. A third indictment returned April 19 alleged three counts of perjury. The first count superceded the original perjury indictment; the others charged that during his January 30 testimony, Molnar lied about both his receipt of bribe monies and his knowledge of Migliaccio's bribe.

At the beginning of the jury trial on January 6, 1976, the court and both parties agreed to consolidate one misconduct in office count, which alleged failure to report Molnar's conversation with Migliaccio, with the latter perjury indictment. The court would dismiss the remaining counts of the March 27 indictment upon a verdict as to the consolidated charges.

The defendant did not contest the fact that he spoke with Migliaccio on the telephone on November 21, 1973, that he failed to report the conversation or that he denied it under oath. His sole defense was that he had forgotten the conversation ever happened. Molnar's automobile accident occurred 13 days before he spoke with Migliaccio. Defendant contended that his head injury had caused anterograde amnesia, which impaired his memory for a period of time following the accident. Molnar testified that at the time of his grand jury appearances he had no memory concerning the November 21 conversation. He still claimed to have no recollection at the time of trial. Molnar's wife and daughter confirmed his account of the accident and testified further as to defendant's subsequent memory problems.

Medical testimony on the issue of defendant's amnesia was equally divided between defense and prosecution. Three expert witnesses for the defense testified that Molnar suffered a concussion as a result of the November 8, 1973 auto accident which could have caused him to suffer anterograde amnesia. So afflicted, it was possible that he would not have remembered the telephone conversation of November 21. The State's three experts testified in rebuttal either that Molnar had not sustained a concussion or that his head injury was not likely to cause memory loss.

During cross-examination of the investigator who recorded Molnar's conversation, defense counsel inquired as to the witness's role in preparing the prosecutor for Molnar's first grand jury appearance. Sustaining the State's objection to this line of questioning, the trial court flatly rejected defense counsel's assertion that the case presented an issue of entrapment.

At the close of the State's evidence, defendant moved to dismiss the indictments on the ground that he was entrapped into committing perjury and misconduct in office. The trial court denied these motions and later rejected counsel's request to charge the jury regarding the defense of entrapment. The court's instruction concerning amnesia stated that it "is a mental illness and the burden of proving it by a preponderance of the believable evidence is on the defendant who asserts the defense."

On January 22, 1976, the jury returned a guilty verdict on the misconduct in office and two of the perjury charges. Since the jury could not reach a verdict on the third perjury count, relating to part of Molnar's January 30 testimony, the court declared a mistrial as to that count. Defendant later received concurrent sentences of one to two years imprisonment for each conviction.

The Appellate Division reversed and ordered a new trial on the ground that the amnesia instruction, which placed the burden of persuasion on defendant by a preponderance of the evidence, was erroneous. 161 *N.J.Super.* at 450–451, 391 *A.2d* 1225. Both the majority and the dissenting judge upheld the trial court as to all other issues raised by defendant, including the preclusion of defendant's entrapment defense.

The State appealed as of right the Appellate Division's reversal on the amnesia issue. *R.* 2:2–1(a)(2). We later granted defendant's cross-petition for certification to consider whether the investigative techniques leading to this prosecution constituted entrapment. 81 *N.J.* 284 (1979). We now affirm in part and reverse in part.

II

Entrapment exists when criminal conduct is the product of the creative activity of law enforcement officials. *Sherman v. United States,* 356 *U.S.* 369, 372, 78 *S.Ct.* 819, 2 *L.Ed.2d* 848 (1958); *State v. Talbot,* 71 *N.J.* 160, 165 (1976); *State v. Dolce,*

41 *N.J.* 422, 430, 197 *A.2d* 185 (1964). When the defendant establishes entrapment, he must be acquitted—not for want of criminal conduct, but because the methods employed by law enforcement officials are repugnant to public policy. *Dolce,* 41 *N.J.* at 431. Judicial abhorrence of entrapment springs from the fundamental precept that courts may not abide illegality committed by the guardians of the law. As we maintained in *Dolce,* 41 *N.J.* at 431; "[C]ourts will not permit their process to be used in aid of a scheme for the actual creation of a crime by those whose duty it is to deter its commission."

In articulating this judicial mandate, our Court has adopted two standards respecting entrapment. The traditional or subjective standard defines entrapment as law enforcement conduct which implants in the mind of an innocent person the disposition to commit the alleged crime, and hence induces its commission. *State v. Stein,* 70 *N.J.* 369, 391 (1976); *Dolce,* 41 *N.J.* at 430. Under this traditional formulation, the defense of entrapment is limited to those defendants who were not predisposed to commit the crime induced by government actions.

In recent years, however, this Court has fashioned a second, independent standard for assessing entrapment. It recognizes that when official conduct inducing crime is so egregious as to impugn the integrity of a court that permits a conviction, the predisposition of the defendant becomes irrelevant. See *State v. Redinger,* 64 *N.J.* 41, 50 (1973). This Court recently explained in *Talbot* :

> [A]s the part played by the State in the criminal activity increases, the importance of the factor of defendant's criminal intent decreases, until finally a point may be reached where the methods [employed] by the State to obtain a conviction cannot be countenanced, even though a defendant's predisposition is shown. Whether the police activity has overstepped the bounds of permissible conduct is a question to be decided by the trial court rather than the jury. [71 *N.J.* at 167–168]

In that case, the Court specifically ruled that this "objective" strand of the entrapment defense was premised on considerations of fundamental fairness. *Id.* at 168.

In *Redinger,* defendant appeared at a friend's municipal court trial for careless driving and falsely testified under oath that he, not his friend, was the driver of the automobile. As a result, the friend was acquitted and Redinger received a summons. The police subsequently uncovered two eyewitnesses to the incident who stated that it was actually the friend and not Redinger who had been driving. Prior to Redinger's municipal court appearance on his own careless driving charge, the police advised the judge of the witnesses' statements and arranged to have Redinger called to the stand when he pleaded guilty. Following his testimony, Redinger was charged that same night with perjury in both court proceedings.

This Court upheld Redinger's perjury conviction relating to testimony at the first trial but dismissed the charge with respect to the second proceeding on grounds of fundamental fairness. Justice Sullivan, speaking for a unanimous Court, maintained:

> [T]he State should have no part in any kind of trickery. What happened at [Redinger's second court appearance] smacks of entrapment. The police by that time had statements from two witnesses that [Redinger's friend] was actually driving the car. This evidence was not disclosed to Redinger at the hearing. Instead, in effect, he was allowed to walk into a waiting charge of perjury. This was not fair play. [64 *N.J.* at 50]

What was most offensive about Redinger's entrapment was that the law enforcement officials used the supposedly neutral forum of the municipal court as a prosecutorial tool. To allow such conduct would erode public confidence in the impartiality and fairness of the judicial process.

█ We note that this second, objective standard survives the enactment of the New Jersey Code of Criminal Justice, *N.J.S.A.* 2C:1–1 *et seq.*[2] In defining the defense of entrapment, *N.J.S.A.* 2C:2–12 provides in part:

---

[2]Since the Code's rules of construction provide that its definition of entrapment "do[es] not apply to offenses committed prior to its effective date," *N.J.S.A.* 2C:1–1(b), the prior law governs the present case. See *N.J.S.A.* 2C:1–1(b)–(d). We nevertheless present our analysis of the new statute for the guidance of the bench and bar.

a. A public law enforcement official or a person engaged in cooperation with such an official or one acting as an agent of a public law enforcement official perpetrates an entrapment if for the purpose of obtaining evidence of the commission of an offense, he induces or encourages and, as a direct result, causes another person to engage in conduct constituting such offense by either:

(1) Making knowingly false representations designed to induce the belief that such conduct is not prohibited; or

(2) Employing methods of persuasion or inducement which create a substantial risk that such an offense will be committed by persons *other than those who are ready to commit it.* * * * [emphasis added]

Although described as an intermediate position between the subjective and objective views on entrapment, see II *New Jersey Penal Code: Final Report of the New Jersey Criminal Law Revision Commission* 77 (1971), the Code focuses upon lack of criminal predisposition. Thus, the new statute does not deal "with the specific situation involved" in cases like *Talbot* and *Redinger,* thereby preserving the "objective" entrapment defense. See *N.J.S.A.* 2C:2–5. Moreover, since it is based upon constitutional considerations of due process and fundamental fairness, this objective approach necessarily remains good law.

██ Although the Appellate Division acknowledged both standards of entrapment, it nonetheless agreed with the trial court that under the present facts there was "no suggestion of entrapment." 161 *N.J.Super.* at 440. We agree with the Appellate Division that there was no official inducement to withhold from the authorities the contents of Migliaccio's telephone call. Although the escaped prisoner undeniably acted as an agent of law enforcement officials, he did not encourage Molnar to keep the conversation secret or to deny the phone call under oath. However, we disagree with the Appellate Division's sweeping conclusion that the facts present no suggestion of entrapment.

It is true that there was no official inducement for Molnar to commit perjury during his grand jury appearances. Nor did the police activities leading up to defendant's first grand jury appearance on January 30, 1974 violate fundamental fairness. Although it is likely that the prosecutor believed that defendant would perjure himself at the first grand jury appearance, com-

pelling the defendant to testify under oath concerning a suspicious telephone conversation does not overstep the bounds of permissible investigative conduct. However, having Molnar testify a second time on February 6, 1977 that he did not speak with Migliaccio following his escape is impermissible. It is nothing less than allowing Molnar to walk into a waiting charge of perjury. The grand jury, a designedly neutral body with limited adjudicatory powers, thus becomes a mere tool of the prosecutor. This violates fundamental fairness and the principle of judicial integrity laid down in *Redinger*.

As in *Redinger*, defendant here had previously sworn to the same false statements for which he was indicted. The facts of Molnar's second grand jury appearance are inescapably parallel to *Redinger*. We therefore hold as a matter of law that the defendant may not be prosecuted for his February 6 testimony. The corresponding count of his perjury indictment must be dismissed.

### III

Before addressing the issue of burden of proof concerning amnesia, we must decide whether the procedural provisions of the New Jersey Code of Criminal Justice, *N.J.S.A.* 2C:1–1 *et seq.*, apply to this case. The effective date of the Code was September 1, 1979, *N.J.S.A.* 2C:98–4—after Molnar's conviction. However, *N.J.S.A.* 2C:1–1(c) provides:

> In *any case pending on* or initiated after the effective date of the code involving an offense committed prior to such date:
>
> (1) The procedural provisions of the Code shall govern, insofar as they are justly applicable and their application does not introduce confusion or delay;
> * * * [emphasis added]

The Code does not delineate which of its provisions are "procedural." In its Final Report, the New Jersey Criminal Law Revision Commission stated that the portion of the 1971 proposed Code identical to subsection c(1) was adopted from Rule 59 of the Federal Rules of Criminal Procedure. See II *New Jersey*

*Penal Code: Final Report of the New Jersey Criminal Law Revision Commission* 1 (1971). See also 2 C. Wright, *Federal Practice and Procedure* § 403 at 66 (1969). However, that rule does not itself define "procedural."

■ While in most contexts "it is simplistic to assume that all law is divided neatly between 'substance' and 'procedure,'" *Busik v. Levine*, 63 *N.J.* 351, 364 (1973), app. dism., 414 *U.S.* 1106, 94 *S.Ct.* 831, 38 *L.Ed.2d* 733 (1973), the Legislature apparently intended to draw just such a distinction in *N.J.S.A.* 2C:1–1(c)(1). The guideposts of "confusion or delay" in 2C:1–1(c) indicate that this provision broadly encompasses the process by which the State attributes guilt and imposes punishment. In the context of a codified criminal law, "procedure" refers to the conduct of a "prosecution for [an] offense," *N.J.S.A.* 2C:1–1(b), as contrasted with the "substantive" definitions of conduct declared be criminal. "A rule of procedure may have an impact upon the substantive result and be no less a rule of procedure on that account." *Busik*, 63 *N.J.* at 364. Thus burdens of proof—those rules governing the degree of certainty the evidence must engender to warrant a given disposition by the trier of fact—are "procedural" matters within the meaning of *N.J.S.A.* 2C:1–1(c)(1).

■ Although we view the term "case pending" literally to embrace undecided appeals as well as ongoing trials,[3] the conclusion that the Code's burden of proof provisions apply to this case does not follow automatically. Such provisions are to govern only when they are "justly applicable" and do not "introduce confusion or delay." *N.J.S.A.* 2C:1–1(c)(1). Defendant's trial

---

[3]After oral argument in this case, the Appellate Division decided *State v. Parks*, 171 *N.J.Super.* 61 (App.Div.1979), in which it held that this term referred only to proceedings occurring prior to the entry of judgment of conviction. In view of our conclusion to the contrary, that holding is overruled.

concluded before the Code took effect. To measure the correctness of the trial court's instructions against standards that had not been promulgated at the time would not be a just, even-handed application of the Code's procedural provisions. Conversely, absent some constitutional prohibition,[4] there is nothing fundamentally unfair about assessing the burdens of proof employed at trial by the caselaw principles then prevailing. A new trial based solely on the trial court's failure to apply a statute which had not yet taken effect would surely "introduce * * * delay" contrary to the legislative mandate. See *N.J. S.A.* 2C:1–1(c)(1). We therefore conclude that the trial court's instruction regarding the burden of proof as to amnesia is to be judged by the law prevailing at the time of trial.

## IV

We begin our discussion of Molnar's amnesia defense by noting that those few New Jersey cases in which a defendant has interposed a similar defense have treated the claim in terms of insanity.[5] In *State v. Lynch,* 130 *N.J.L.* 253 (E. & A. 1943), the defendant asserted that as a result of "bromide poisoning" he had suffered such total amnesia that he could not form a criminal intent with regard to events—including the murder with which he was charged—transpiring during that period. The Court of Errors and Appeals held that evidence of this total

---

[4]*Sandstrom* v. Montana, *442* U.S. *510, 99* S.Ct. *2450, 61* L.Ed.2d *39 (1979);* Mullaney v. Wilbur, *421* U.S. *684, 95* S.Ct. *1881, 44* L.Ed.2d *508 (1975);* In re Winship, *397* U.S. *358, 90* S.Ct. *1068, 25* L.Ed.2d *368 (1970).*

[5]Other New Jersey cases which dealt with amnesia discussed it only as affecting a defendant's competency to stand trial. *State v. Pacheco,* 106 *N.J.Super.* 173 (App.Div.1969), aff'd o. b., 54 *N.J.* 579 (1969), *cert.* den., 400 *U.S.* 834, 91 *S.Ct.* 68, 27 *L.Ed.2d* 65 (1970); *State v. Pugh,* 117 *N.J.Super.* 26 (App.Div.1971), certif. den., 60 *N.J.* 22 (1972). Both these cases accepted the view that the mere inability to remember the crime does not affect capacity to stand trial.

amnesia was sufficient to present a *prima facie* case of temporary insanity and placed upon defendant the burden of establishing the defense by a preponderance of the evidence. *Id.* at 256–257. What the court in *Lynch* labeled "total amnesia" is similar to later cases in which the defendant claimed to have "blacked out" while he was committing the criminal acts. In such cases, the defendant has been required to establish the *M'Naughten* defense of insanity by a preponderance of the evidence. See *State v. Coleman,* 46 *N.J.* 16, 23–29 (1965), *cert.* den., 383 *U.S.* 950, 86 *S.Ct.* 1210, 16 *L.Ed.*2d 212 (1966); *State v. Cordasco,* 2 *N.J.* 189, 193–199 (1949); *cf. State v. Risden,* 56 *N.J.* 27 (1970) (defense of temporary insanity held to be raised by claim that defendant had "no recollection" of events during the time she killed her husband); see also *State v. Lucas,* 30 *N.J.* 37, 68 (1959); *State v. Huff,* 14 *N.J.* 240, 250 (1954) (stating *M'Naughten* insanity defense); *N.J.S.A.* 2C:4–1 (codifying *M'Naughten* test).

The present case is clearly distinguishable from these earlier amnesia decisions. Such cases involved situations in which loss of memory accompanied a claim of insanity. The amnesia was an incidental by-product of the temporary insanity which the defendants interposed as an affirmative defense. In cases involving acts committed during "black-outs" or periods of unconsciousness, the mere fact of memory loss was not the defense. By contrast, here a defect in Molnar's powers of recollection is *itself* the sole defense. His sanity is not at issue.

Carried to its extreme, the notion of amnesia can connote any loss of memory, even the most trivial inability to recollect. See *Lester v. State,* 212 *Tenn.* 338, 344, 370 *S.W.*2d 405, 408–409 (Sup.Ct.1963); 3A R. Gray, *Attorneys' Textbook of Medicine* § 83.60 (3d ed. 1962). Yet Molnar did not claim that the ordinary frailties of the mind prevented him from remembering what he had learned about the bribery plot at the prison. He attempted to show by expert testimony that a traumatic injury temporarily impaired his normal capacity to recall any subse-

quent experiences. At the same time, he put the State to its burden of showing beyond a reasonable doubt that he knew of the illicit scheme when he failed to report it and when he testified to the contrary before the grand jury.

■ As a logical matter, Molnar's affirmative defense of amnesia does not necessarily refute his knowledge of official corruption. Assuming he had established that his memory was usually deficient, it would remain open to question whether he retained a recollection of *the specific facts* which were the subject of official investigation. Even suffering from amnesia, he may still have remembered his conversation with Migliaccio. Thus the State need not disprove defendant's amnesia beyond a reasonable doubt and Molnar's request to charge the State with that burden was properly denied.

■ We recognize that by putting the general state of his memory at issue, defendant does more than challenge the State's ability to prove all the elements of perjury and misconduct in office beyond a reasonable doubt. Essentially, he asserts that it would be fundamentally unfair for the State to punish him if he did in fact suffer from a mental disease or defect impairing his memory. We agree. Given the existence of such a condition, any attempt by the trier of fact to determine whether his impairment extended to a specific experience would be hopelessly speculative. Thus, "contemporary notions of fairness," *State v. Toscano,* 74 *N.J.* 421, 432 (1977); see *State v. Culver,* 23 *N.J.* 495, 503, *cert.* den., 354 *U.S.* 925, 77 *S.Ct.* 1387, 1 *L.Ed.*2d 1441 (1957), require that this affirmative defense of amnesia be available when specific knowledge of the accused is at issue.[6]

_____

[6]The defense of amnesia announced today does not survive the Code. Section 2C:4–2 provides:

Evidence that the defendant suffered from a mental disease or defect is admissible whenever it is relevant to prove that the defendant did not have a state of mind which is an element of the offense. In the absence

Such a defense, dependent on the vagaries of both human memory and our knowledge of its mechanism, can be easily fabricated after the commission of a criminal act. If the burden of proof were not placed on the defendant, perjury trials would be a particularly fertile field for the abuse of the amnesia defense, especially in light of the recognition that "amnesia is present in some degree in everyone * * *." Note, "Amnesia: A Case Study in the Limits of Particular Justice," 71 *Yale L.J.* 109, 136 (1961). We therefore hold that "guided only by common law principles which conform to the purposes of our criminal justice system," *State v. Toscano,* 74 *N.J.* at 432; *Schipper v. Levitt & Sons, Inc.,* 44 *N.J.* 70, 90 (1965); *Collopy v. Newark Eye and Ear Infirmary,* 27 *N.J.* 29, 43–45 (1958); *State v. Culver,* 23 *N.J.* at 503, it is appropriate to impose the burden of proof regarding the defense of amnesia upon the defendant by a preponderance of the evidence. We accordingly find no error in the trial court's instruction.[7]

## V

We therefore reverse the Appellate Division on the issue of amnesia and hold that the trial judge was correct in requiring

of such evidence, it may be presumed that the defendant had no mental disease or defect which would negate a state of mind which is an element of the offense.

Thus any evidence that a defendant did not remember particular facts which form part of the basis for criminal liability does not establish a separate defense apart from insanity, but would appear to be admissible if it is relevant to the required mental state. It is not entirely clear to us that the Legislature intended such an easily fabricated condition as "amnesia" to be embraced by this provision. We are not called upon here to decide the point, however, and therefore decline to do so. See Senate Judiciary statement to Senate Bill No. 3203 at 2 (1979) (clarifying the scheme of sections 4–1 to 4–11 of the Code).

[7]Besides giving a preponderance instruction on the "mental illness" of amnesia, the trial court charged the jury that it must find all elements—specifically including mental elements—of perjury and misconduct in office beyond a reasonable doubt.

the defendant to establish the defense of amnesia by a preponderance of the evidence. Furthermore, we reverse the Appellate Division in part on the issue of entrapment. Defendant's perjury conviction stemming from his second grand jury appearance is hereby vacated and the corresponding count of the indictment dismissed. His remaining convictions are reinstated.

*For reversal and reversal in part*—Chief Justice WILENTZ and Justices SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER, HANDLER and POLLOCK—7.

*For affirmance*—None.