495 So.2d 787 (1986)
STATE of Florida, Appellant,
v.
Ronald EICHEL, Appellee.
No. 85-304.
District Court of Appeal of Florida, Second District.
September 17, 1986.
Jim Smith, Atty. Gen., Tallahassee and Theda James Davis, Asst. Atty. Gen., Tampa, for appellant.
James E. Aker of Icard, Merrill, Cullis, Timm & Furen, P.A., Sarasota, for appellee.
RYDER, Judge.
The state appeals a trial court order which granted appellee's motion to dismiss. We reverse.
The state charged Eichel with possession of cocaine and possession of marijuana. Eichel filed a motion to dismiss under Florida Rule of Criminal Procedure 3.190(c)(4). The state and defense entered into a written stipulation which provided, among other things, that deposition testimony and written statements under oath of certain witnesses would be admitted into evidence for the purpose of Eichel's pretrial motion to dismiss.
Smart testified on deposition that she is a special duty police officer with the Sarasota County Sheriff's Department. On July 20, 1984, she met Eichel at Merlin's Bar in Sarasota. Smart was off duty at the time. She had never heard of Eichel nor participated in any surveillance of him prior to that date.
Smart was seated at the bar when Eichel approached her and engaged her in conversation. At one point, Smart told Eichel that she didn't drink and he said, "Oh, then you must like cocaine." Smart replied, "No, I don't. I have never tried it." The two stayed at Merlin's for about one hour. Smart did not tell Eichel her occupation because she "didn't feel like it." Eichel invited Smart to another bar, the Patio, and she agreed to accompany him there. While enroute to the bar, Eichel smoked marijuana and used cocaine. He offered some to Smart and tried to persuade her to use it, but she refused.
At the Patio bar, they met Eichel's friend, Bob Fernandez. While at the bar, Fernandez commented to Smart that he wished Eichel would not use so much drugs. Smart and Eichel stayed at the Patio for a long time and it was quite late when they left. Smart left the Patio with Eichel and went to his hotel room on Longboat Key. While enroute to the hotel, Eichel again tried to persuade Smart to try drugs. She then decided to tell him she was a police officer because she was getting *788 really upset with him "trying to push that on her." In the parking lot of the hotel, just prior to going to Eichel's room, Smart told him for the first time that she worked for the Sheriff's Department, was not on duty, did not want him to discuss cocaine and marijuana, and did not want to see it anymore. She also told him she did not have arrest authority when she was off duty. At that time, she had made the decision to get information and pass it on to the Tactical Unit and the Detective Division. She did not tell Eichel that she was going to tell the Sheriff's Department.
Eichel purchased an alcoholic drink at the hotel bar. Smart accompanied him to his room where he changed into shorts. They then walked on the beach for "quite a while" and then returned to his room. Even after finding out that Smart was a police officer, Eichel kept offering Smart drugs. Eichel tried to persuade Smart to remain for the night with him, but she refused. He drove her back to her car around 4:00 a.m. He asked if they could see each other again and Smart gave him her telephone number. Smart admits to kissing Eichel on the beach and at the Patio bar.
The following Monday, Smart told her supervisor about the incident. The department did not take action because Smart never expected to hear from Eichel again. However, Eichel subsequently called Smart three times from his home in Atlanta and they made plans to see each other again during his next trip to Florida. During the second phone call, Eichel asked Smart if she would arrest him if he brought down his cocaine on his next trip and she replied, "Yes, sir."
Eichel returned to Sarasota on September 20, 1984. Prior to meeting Eichel again, Smart's department placed a concealed microphone and transmitter on her person. She later testified that she considered the meeting a date to have a "good time." She met Eichel at the Holiday Inn and they went from there to a restaurant. Once in the car, Eichel began discussing drugs and asked, "Can I be myself or are you going to arrest me?" Smart said, "No, be yourself, I won't arrest you." Eichel then lit up a marijuana cigarette and said, "Well, I guess you're telling the truth because this is a felony." Smart did not say anything but "let it slide." Smart said that she did not make any misrepresentation to Eichel because she, in fact, was not going to arrest him  somebody else was, meaning the two deputies with radio receivers who were following Eichel's car. Smart did not tell Eichel she was on duty. Eichel offered her some marijuana and she declined. The deputies did not arrest Eichel that evening because Smart's microphone and transmitter malfunctioned and the deputies failed to arrive at the scene at a prearranged time. During the evening, Eichel asked Smart to spend the night and the next four days with him. She declined, but agreed to go to dinner and dancing with him on the following night at the Patio bar.
When Smart met Eichel the next evening, she again received a concealed microphone and transmitting device. Eichel offered her some cocaine and told her he had come to Sarasota "for the express reason to corrupt a cop." After much coaxing from Eichel, Smart finally agreed to try the cocaine. They went outside and he offered her the cocaine but she then said she needed a drink first. The attempt to arrest Eichel at this time was abandoned because the concealed microphone was not functioning properly. After they went back inside the bar, Smart agreed to go elsewhere with Eichel. They left the Patio and Eichel again brought out the cocaine. While Eichel was offering Smart the cocaine, he was arrested by two deputies.
Smart admitted that she and Eichel stood with their arms around each other at the Patio. Smart said that she felt that Eichel thought he had a personal relationship going with her and wanted to continue a steady relationship with her on those future occasions when he visited Sarasota every three or four months.
*789 Fernandez testified on deposition that he was with Smart and Eichel at the bar on the night of the arrest. They did not discuss drugs in his presence and he has never seen Eichel in possession of drugs. Eichel told Fernandez that he had had sexual relations with Smart and that she was a police officer. Fernandez was with Smart and Eichel on both occasions when they were at the Patio. Smart was extremely attractive, her clothes accented her nice figure. She "came on" very strong, very physical, and was a very touching person. When Fernandez danced with Smart, she brought her body close to his.
Fernandez saw Smart and Eichel kissing each other while dancing and while they were standing at the bar. Fernandez thought Smart was interested in "fooling around." Smart told Fernandez that she would meet with him when he came down to Sarasota from Tampa.
On the night of the arrest, just before leaving the Patio bar, Eichel, Smart, Fernandez and Fernandez's female companion decided that they would leave the bar and go back to the hotel room and have a party. All persons, including Smart, thought it was a great idea.
At the hearing on Eichel's motion to dismiss, the defense argued that Eichel was entrapped by the actions of the female police officer, and relied upon Spencer v. State, 263 So.2d 282 (Fla. 1st DCA), cert. denied, 267 So.2d 835 (Fla. 1972). The state relied upon State v. Liptak, 277 So.2d 19 (Fla. 1973), and argued that because Smart had not offered any personal consideration and was not on duty at the time, the defense of entrapment was not available. After the hearing, the trial court entered an order granting Eichel's motion to dismiss. The court found that the evidence presented was sufficient as a matter of law to establish the defense of entrapment. Both the state and Eichel agree that Cruz v. State, 465 So.2d 516 (Fla.), cert. denied, ___ U.S. ___, 105 S.Ct. 3527, 87 L.Ed.2d 652 (1985) controls on appeal.
In Cruz, the Florida Supreme Court ruled that when considering an entrapment defense, a trial judge must first apply the threshold objective test to determine whether the defendant was entrapped as a matter of law. If the defense passes this threshold test, then the subjective test, which focuses upon the predisposition of the defendant, is a question for the jury. Cruz, 465 So.2d at 521.
The threshold objective test focuses upon whether the police have resorted to impermissible techniques to obtain a conviction. Id. at 520. This view recognizes that there may be official conduct which is so egregious as to impugn the integrity of a court that the predisposition of a defendant becomes irrelevant. Cruz 465 So.2d at 521 (quoting State v. Molnar, 81 N.J. 475, 484, 410 A.2d 37, 41 (1980)). See also Spencer v. State, 263 So.2d 282 (Fla. 1st DCA 1972). Therefore, the initial question is whether "police conduct falls below standards, to which common feelings respond, for the proper use of governmental power." Cruz, 465 So.2d at 521 (quoting Sherman v. United States, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958)).
The Cruz court then formulated a two-prong inquiry for use in applying the threshold objective test. The first prong is whether the police activity had as its end the interruption of a specific ongoing criminal activity. This inquiry should reveal whether the police activity sought to prosecute crime where no such crime exists but for the police activity engendering the crime. It is upon this prong which the Florida Supreme Court found Cruz to have a valid entrapment defense. Applying this prong to the case before us, there is no basis to conclude that Eichel would not have possessed marijuana and cocaine but for the police activity.
The second prong of the inquiry is whether the police utilized means reasonably tailored to apprehend those involved in the ongoing criminal activity. Cruz, 465 So.2d at 522. Further consideration under *790 this second prong is whether a government agent induced or encouraged the defendant to engage in conduct which is a criminal offense "by either: (a) making knowingly false representations designed to induce the belief that such conduct is not prohibited; or (b) employing methods of persuasion or inducement which create a substantial risk that such an offense will be committed by persons other than those who are ready to commit it." Id. (emphasis added) (quoting Model Penal Code § 2.13 (1962)).
In this case, the police utilized means which were reasonably tailored to apprehend Eichel during one of his seemingly frequent drug usage episodes. Although Eichel may have relied upon Smart's assurance that he could be himself and she would not arrest him, Smart in no way induced or encouraged Eichel to use drugs in her presence despite the fact that she encouraged him to think they had a personal, intimate relationship. The evening of their first meeting, she told him she was a police officer and told him not to use drugs while he was with her. During one of the subsequent phone calls, she told him she would arrest him if he brought his cocaine with him on his next visit.
Because Smart did not induce or encourage Eichel to engage in his drug usage, the second prong of the objective threshold test of whether this particular police activity was valid must be answered in the affirmative. Therefore, as a matter of law, we cannot rule that Eichel presented a sufficient entrapment defense under the objective test. Whether Eichel has a sufficient entrapment defense under the subjective view, i.e., predisposition to commit the crime, remains a question for the jury. Cruz, 465 So.2d at 521.
The trial court's order granting Eichel's motion to dismiss is reversed and set aside. We remand this cause to the trial court for further proceedings consistent with this opinion.
Reversed and remanded.
DANAHY, C.J., and GRIMES, CAMPBELL, SCHOONOVER, LEHAN, FRANK, HALL and SANDERLIN, JJ., concur.