## STATE OF NEW JERSEY, DEFENDANT IN ERROR, v. EDWARD RODIA, ALIAS EDDIE WHITE, ALIAS EDWARD BRODY, PLAINTIFF IN ERROR.

Argued June 22, 1944—Decided October 17, 1944.

For the plaintiff in error, *Rocco Palese.*

For the defendant in error, *Gene R. Mariano.*

The opinion of the court was delivered by

BODINE, J. Edward Rodia was convicted of the murder of his wife on December 29th, 1943. The jury did not recommend life imprisonment. It was with his razor that her throat was cut, the jugular vein and windpipe being severed. The couple had separated after he lost his employment. She later sold their car and furniture. On the day of the murder, he called upon her early in the evening in a borrowed car and took her for a ride. He then pulled to the side of the road and stopped the car. Just what then occurred can only be deduced from his story. Whether there was a dispute about money matters is not certain. At all events, he drove from the scene of her death and reported to the police.

His statement immediately after his arrest was as follows: "*Q.* And what did you do? *A.* I pulled the razor and I cut her. I got scared. *Q.* Do you know where you cut her? *A.* Yes, around the face somewhere. *Q.* What was your intention when you started to do the cutting? *A.* To go for both of us, me and her. *Q.* You thought it over before you started it and talked it over or was it your suggestion? *A.* We talked it over, did you say? *Q.* Yes. *A.* Yes, we talked it over. *Q.* You mean to tell me she agreed to die there with you? *A.* Both of us, yes, yes, but I was a bum and I didn't

kill myself. I am going to die just the same. It makes no difference. I will just go a little later."

At the trial he testified that the statement was correct, except that part not quoted in which he said that he had asked for a part of the money realized from the sale of the property which had been turned over to her after the separation.

It is urged that there was error in overruling an objection to the following question propounded to the defendant upon cross-examination: "Were you ever convicted of the crime of atrocious assault and battery by cutting on the 13th day of April, 1928?" The answer was as follows: "I think I was, I think I was."

The question was predicated under legislative authority *R. S.* 2:97–13. The point is made that the prosecutor should not have included in his question the words "by cutting." In *State* v. *Silver,* 2 *N. J. Mis. R.* 479, the prosecutor asked the defendant, upon cross-examination, the duration of his sentence. The Supreme Court said: "If, instead of proving the convictions on cross-examination, the state had seen fit to produce the record of the conviction, that record would have shown the sentence as well as the conviction. It was not improper, therefore, for the state to prove by the cross-examination anything that would appear in the record." This ruling was affirmed, 101 *N. J. L.* 232. See, also, *State* v. *Merra,* 103 *Id.* 361.

The crime of atrocious assault and battery is effected by maiming or wounding another. *R. S.* 2:110–1. It is usual in this state to charge in the indictment that the defendant did then and there "strike, beat, cut, lacerate, wound, maim and ill-treat" so and so. 2 *Regan & Schlosser, Criminal Law of New Jersey, Suggested Forms, Form* 31, *p.* 1189.

The interrogation of the defendant as to previous convictions denounced in *State* v. *Mount,* 72 *N. J. L.* 365, did not relate to matters which would appear in the judgment record but to matters not of record, *i. e.,* the bulk of the man assaulted. The defendant then being confronted with the man was asked as to the way he had made the scar on his face and many other matters which would not appear if the

state had proved the conviction in a proper manner. Obviously, the state may not, on cross-examination of the defendant as to a previous conviction of crime, go into matters not of record. But the rule is as shown that it may go into matters which appear in the record of conviction.

The proof of the conviction by record would undoubtedly have shown the charge of cutting. So the question was proper and the defendant suffered no injury therefrom.

It is next urged that because the foreman of the jury first said that they had found the defendant guilty and was then told by the court that the verdict must recite the degree of the crime and then stated that the jury had found the defendant guilty of murder in the first degree that there was no proper verdict. There is no merit in this contention. The verdict as recorded and pronounced by the foreman was perfectly clear. The jurors were polled and each stated that they had found a verdict of murder in the first degree. There would be no reason whatever in directing the jury to retire and then return with the same verdict because of the foreman's inadvertence of speech which was quickly corrected and confirmed when the jury was polled.

There was proof in the case as to the defendant's mental age. Complaint is made that the trial court said in its charge: "It is my observation that the so-called mental age theory of the experts, at least as applied to adults, is based upon so arbitrary and unnatural a scale of ages as a standard, as to be utterly misleading to a layman and practically useless, in the administration of justice by trial by jury." The language finds support in *State* v. *Schilling,* 95 *N. J. L.* 145, and *State* v. *Ehlers,* 98 *Id.* 236. The test of insanity in this state is the rule laid down in *McNaghton's Case* (10 *Clark & Finnelly* 200; 8 *Eng. Reprint* 718), and reaffirmed many times by this court. *State* v. *Noel,* 102 *N. J. L.* 659; *State* v. *Carrigan,* 93 *Id.* 268.

The purpose of injecting into the case all the testimony as to mental age was to show that the defendant was incapable of planning, premeditating or designing an intent to kill. The trial judge was most patient in receiving this evidence. The comment that he made was in all respects proper and

perhaps too temperate. His right to comment was clear. *State* v. *Jefferson,* 129 *N. J. L.* 308.

There seems to be nothing in the objections offered to the rebuttal testimony that the life of the defendant and his wife had not always been one of love and accord. In his testimony he had sought so to show. The state merely produced evidence to overcome this testimony. It had a perfect right to show that proceedings had been instituted before a Philadelphia magistrate because of defendant's hostile acts towards his wife. This did not infringe the rule that in the trial for a particular crime evidence of guilt of other crimes may not be received. When the defendant sought to show a life of peace and harmony, the state was free to show otherwise, and this it did by proof of the proceedings in Philadelphia and by the testimony of those who had observed the contrary.

The other points argued have been carefully considered and are without merit sufficient to require further discussion.

The judgment is affirmed.

HEHER, J. (Dissenting.) After receiving evidence from psychologists and psychiatrists tending to show that the accused was of the mental age of but eleven years, and so, to use the language of one, "limited in the generalizations which he can make and limited in his ability to hold to an extended plan," and, in the view of another, unable to "think through purposely" the "acts as given," the learned trial judge instructed the jury as follows:

"For my own part, and in nowise is this urged upon you as controlling, it is my observation that the so-called mental age theory of the experts, at least as applied to adults, is based upon so arbitrary and unnatural a scale of ages as a standard, as to be utterly misleading to a layman and practically useless, in the administration of justice by trial by jury."

This I conceive to have been error prejudicial to the substantial rights of the accused. One of the defenses interposed on his behalf was that he "did not have the faculties to plan, conceive, deliberate or premeditate the murder"

charged. It was the function of the triers of the facts to assay the experts' conclusions, based as they were upon what is now generally regarded as scientific tests of mental capacity, in determining whether the accused had sufficient discernment to distinguish right from wrong with respect to the particular deed, and to act with malice aforethought and the deliberation and premeditation essential to murder of the first degree.

Such was the holding of this court in *State v. Schilling*, 95 *N. J. L.* 145. There, also, expert opinion was adduced that the defendant, of the physical age of twenty-eight years, was of the mental age of eleven years; and the defendant invoked the common-law rebuttable presumption that an infant between the ages of seven and fourteen years is incapable of committing a crime. Mr. Justice Bergen said: "But that is not the precise question presented, which, after all, is whether at the age of twenty-eight he had sufficient mentality to distinguish between right and wrong, for at that age he would be presumed to be capable of committing the crime unless he was able to overcome that presumption by proof of a mental condition rendering him incapable of committing the crime, and whether he did so was a jury question, and they by their verdict have found that he had sufficient mentality to determine that it was wrong to kill this officer. * * * When a man reaches manhood the presumption is that he possesses the ordinary mental capacity normally pertaining to his age, and it is for him to overcome that presumption, and whether he has done so is for the jury to determine. * * * Deficiency of intellect is a species of insanity, and when that is set up as a defense for crime the burden is on the accused to prove it, the presumption being that he is sane." While mental and physical age are in this view identical, the identity is important only as respects the presumption of mental capacity and the burden of proof.

What the trial judge said in this regard was plainly not mere comment on the facts or an expression of his opinion on the weight of the evidence. He thereby set up his own "observation" in matters not of general experience and common knowledge against the testimony of the psychological

and psychiatric experts, and rejected their observations and conclusions as worthless; and thus he invaded the province of the jury on the crucial issue of the existence of mental and moral capacity sufficient to render the accused criminally responsible under the law for the act in question. And it does not matter that the jury were advised that the conclusion of the judge, based upon his "observation," was not "controlling" upon them. What he did was to introduce the results of his own experience in matters not of general knowledge, and therefore not a proper subject of notice without proof. The declaration, unequivocable as it was, that the evidence was "practically useless in the administration of justice by trial by jury" was the moral equivalent of a direction to disregard it. The qualifying phrase adverted to, considered in relation to the context, can have no meaning, for the judge said that his "observation" had demonstrated the evidence was valueless. If such was the case, the testimony had no probative quality whatever, and should not have been received. But the evidence was properly admitted. Convincing proof that the accused's mental development was but that of a normal eleven-year-old boy would necessarily have a substantial bearing in resolving the issue of criminal responsibility; and, while such evidence is to be regarded with a reasonable degree of caution, its weight and value is peculiarly a question for the jury. Want of capacity to commit a crime is a complete defense; and, while one accused of crime may not be wholly irresponsible, in that he comprehended the nature and quality of his act and had the faculty of distinguishing between right and wrong, the degree of capacity may yet be a determining factor on the issue of the existence of a deliberate and premeditated design to kill. *Vide People* v. *Moran,* 249 *N. Y.* 179; 163 *N. E. Rep.* 553.

The credit to be given to a witness "is peculiarly the province of the jury, and any attempt on the part of the court to invade that province and to restrict the jury in that regard, would be highly improper." *State* v. *Rosa,* 72 *N. J. L.* 462. And this rule generally applies to the opinions of expert witnesses. Only "reasonably guarded" comment by the trial judge is permissible. 23 *C. J. S.* 718.

The language of the challenged instruction was taken verbatim from the opinion of Judge White, for this court, in *State* v. *Ehlers,* 98 *N. J. L.* 236. But there, the comment was made in appraising the evidence of a mental and medical expert to determine whether the verdict was contrary to the weight of the evidence on the issue of mental capacity—a quite different function. An admission made by the witness was considered as coinciding with "the observation of practically all our judges" (citing *State* v. *Schilling, supra*), that the mental age theory is "practically useless." That did not constitute an intrusion upon the domain of the jury.

The virtue of psychological and psychiatric opinion necessarily depends upon the quality of the evidence in the particular case. The state's specialists in these sciences, while differing with the conclusions of the experts called by the accused, seem to have conceded that the mental age doctrine is, after all, but a means of measuring and expressing the *quantum* of mental capacity; and the trial judge's dogmatic pronouncement against its validity was an assumption of power not the judge's under our system of trial by jury. One of the state's specialists testified that the accused, while mentally deficient in some degree, yet "fell well within the limits of the normal." But he said that he considered that one whose "mental age is below nine" is "sufficiently feeble-minded" to be "excused from responsibility for his acts, particularly criminal acts," and that "anyone who has a mental age above nine" is "sufficiently developed" to "know the difference between what is right and what is wrong, to orient themselves, to think for themselves, and so on." And the state's second expert classified the accused as a "dull normal," which he defined as one "of an average age intellectual level anywhere between nine and twelve." Later he said that, though he "did not perform any specific psychological tests," and therefore could not give his "psychiatric impression," he would "probably place" the accused "between twelve and fourteen."

For these reasons, I vote to reverse the judgment, and to award a *venire de novo.*

The Chancellor, the Chief Justice, Mr. Justice Colie, Judge Rafferty, Judge Hague and Judge Thompson join in this opinion.

*For affirmance*—PARKER, CASE, BODINE, DONGES, PERSKIE, PORTER, DEAR, WELLS, DILL, JJ.   9.

*For reversal*—THE CHANCELLOR, CHIEF JUSTICE, HEHER, COLIE, RAFFERTY, HAGUE, THOMPSON, JJ.   7.