199 N.J. Super. 283 (1985)
489 A.2d 691
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
JOHN M. HUMANIK, JR., DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued January 8, 1985.
Decided February 6, 1985.
*286 Before Judges MICHELS, PETRELLA and BAIME.
Joel I. Rachmiel argued the cause for appellant (Rachmiel and Ferdinand, attorneys; Joel I. Rachmiel, on the brief).
Marijean Raffetto Stevens, Deputy Attorney General, argued the cause for respondent (Irwin I. Kimmelman, Attorney General, attorney; Marijean Raffetto Stevens, of counsel and on the brief).
*287 The opinion of the court was delivered by BAIME, J.A.D.
This appeal presents novel questions pertaining to the constitutionality of N.J.S.A. 2C:4-2. As amended, that statute requires the defendant to prove mental disease or defect by a preponderance of the evidence when the defense of diminished capacity is raised.[1] At issue is whether the statute unconstitutionally shifts the burden of proof with respect to an element of the criminal offense. Auxiliary questions concern whether retroactive application of N.J.S.A. 2C:4-2 constitutes a violation of the ex post facto prohibition set forth in the Federal[2] or State Constitution.[3] We hold that the statute is not violative of substantive and procedural due process and was properly applied at defendant's trial. We, thus, affirm defendant's conviction.
The facts necessary for resolution of the difficult issues presented need not be recounted at length. Following a protracted jury trial, defendant was convicted of murder. N.J.S.A. 2C:11-3. Defendant was sentenced to life imprisonment and ordered to serve a term of 25 years without being eligible for parole. In addition, the trial judge imposed a penalty of $10,000 payable to the Violent Crimes Compensation Board. At trial, defendant conceded that he shot and killed his former girlfriend at her parent's home in Toms River. The sole question presented pertained to defendant's state of mind at the time of the homicide. More specifically, defendant contended *288 that he was suffering from a mental disease or defect which precluded him from harboring the requisite mental state required by N.J.S.A. 2C:11-3. Alternatively, defendant claimed that the killing was accidental.
The circumstances directly surrounding the shooting cannot be considered in a vacuum. Rather, the tragic incident was the culmination of a series of attempts by the victim, Lisa Guzzo, to sever her long-standing relationship with defendant. The two first met in the summer of 1978 when defendant was 17 and the decedent was 12. Despite the disparity in their ages, defendant was immediately attracted by Ms. Guzzo. They began dating shortly after her thirteenth birthday. In addition, defendant developed a strong attachment to the Guzzo family. Over the years, defendant often stayed at the Guzzo's home and generally addressed the victim's mother as "mom." This strong relationship was apparently attributable to defendant's "emotionally deprived upbringing." Defendant came from a broken home and resided with his aunt and her two brothers. In any event, defendant's feelings were reciprocated and he continued dating the decedent until the summer of 1981.
On August 5, 1981, Ms. Guzzo told defendant that she had met another man and wished to terminate their relationship. Defendant was obviously devastated. On the following day, he went to the Hillside municipal building and applied for a permit to purchase a gun. After filing his application, defendant made several attempts to determine the identity of the decedent's new boyfriend. When his efforts proved unavailing, defendant proceeded to his uncle's house. While there, defendant's uncle showed him his handgun and demonstrated how to load and unload it. The next day, defendant returned to his uncle's house and "test fired" the weapon. At trial, defendant testified that he harbored thoughts of shooting the decedent at this time.
On the following weekend, defendant stayed at his aunt's summer bungalow in Toms River. After unsuccessfully attempting to meet the decedent at her place of employment in *289 Ortley Beach, defendant went to a sporting goods store where he purchased a box of .32 caliber ammunition for his uncle's gun. He also purchased a hunting knife. It is undisputed that defendant continued to fantasize about killing Ms. Guzzo at this time. Several days after purchasing the ammunition, defendant proceeded to his uncle's house where he obtained the handgun. Thereafter, he made one last attempt to convince the decedent not to leave him. During their conversation, defendant displayed the weapon. When Ms. Guzzo threatened to telephone her mother, defendant departed and went to his aunt's house.
At approximately 7 p.m. that evening, defendant drove to the decedent's home again seeking to determine the identity of her new boyfriend. Defendant carried with him his uncle's fully loaded handgun, a knife and a pair of binoculars he had purchased earlier in the day. When he arrived, defendant noticed a late model M.G. parked in the driveway which he assumed belonged to the decedent's boyfriend. Defendant then parked his automobile approximately a block away from the Guzzo's home and proceeded on foot through the woods. Unable to observe the decedent, defendant returned to his automobile and parked it on another street. Defendant then went back into the woods and waited for the decedent and her boyfriend to leave. After approximately 40 minutes had elapsed, defendant decided to free Ms. Guzzo's puppy from the dog pen hoping that this would attract her attention. When the decedent and her sister came out of the house, defendant, armed with the handgun and the knife, surrepticiously entered the den through the sliding glass door. When Ms. Guzzo returned with her boyfriend, Stanley Emanuels, and her sister, defendant pointed the gun and knife in their direction and ordered them to be seated. During the ensuing hours, defendant sought to persuade Ms. Guzzo to return to him. When she threatened to call for assistance, defendant pulled the telephone off the wall. At approximately 11:30 p.m., defendant heard the sound of an automobile in the driveway. Peering from the window, defendant *290 observed the decedent's parents approaching the house. At this point, defendant, gun in hand, ran toward the sliding glass door which led to the backyard shouting "this is where I make my exit." As he exited, defendant said "it's been nice knowing you Stanley; we could have been friends, Lisa." Defendant pointed the gun at the decedent and fired the fatal shot. After the shooting, defendant fled from the scene and remained a fugitive for a period of two months. During this time, defendant's travels took him to New York, North Carolina and Florida. Defendant was ultimately apprehended in a Las Vegas casino. At the time of his arrest, defendant was carrying the murder weapon.
Defendant testified that the shooting was accidental. According to defendant, he did not purposely pull the trigger. Defendant first realized what had occurred when he saw the decedent fall after the shot was fired and noticed blood on his hand. Conflicting expert testimony was presented with respect to defendant's mental and emotional condition at the time of the incident. Several psychologists testified that defendant suffered from a "borderline personality disorder" and that he did not purposely or knowingly kill the decedent. On rebuttal, the State presented two psychiatrists. They testified that defendant had a marginal "personality disorder," but that his cognitive abilities were in no sense affected. According to their testimony, defendant was fully capable of performing the mental operations required for a conviction under N.J.S.A. 2C:11-3.
The trial judge charged the jury with respect to the offenses of murder, aggravated manslaughter and manslaughter. In his instructions, the judge noted that the "burden of proving the defendant's guilt rest[ed] heavily on the State" and that it "never shifted." The court went on to state that defendant "had no duty or obligation" to prove his innocence. According to the trial judge, the State "had the burden of proving each of the elements of the crimes" charged. In defining the elements of murder, the court emphasized the obligation of the State to prove "purpose or knowledge beyond a reasonable doubt." *291 Absent such a proof, defendant was entitled to an acquittal. The court also instructed the jury with respect to the defense of diminished capacity. In that regard, the trial judge recited defendant's contention that he "suffered from a mental disease or defect" and that this illness precluded him from harboring the requisite culpability required for a conviction of murder. In accordance with the provisions of N.J.S.A. 2C:4-2, the jury was advised that defendant was required to prove the existence of a mental defect or disease by a preponderance of the evidence. After approximately three hours of deliberations, the jury found defendant guilty of murder. This appeal followed.

I
We will first address questions pertaining to the constitutionality of N.J.S.A. 2C:4-2. As noted previously, that statute permits the defendant to introduce evidence of a mental disease or defect to show that he did not harbor the requisite culpability state required for a conviction. Under the statute, the defense is obliged to prove the existence of a mental disease or defect by a preponderance of the evidence. Defendant contends that the statute contravenes settled principles inherent in the concept of due process because it shifts the burden of proving a core element of the crime. We disagree.
The State's obligation to prove the guilt of the accused beyond a reasonable doubt had its genesis in the common law of England and is constitutionally compelled. See, e.g., Mullaney v. Wilbur, 421 U.S. 684, 685, 95 S.Ct. 1881, 1883, 44 L.Ed. 2d 508, 511 (1975); In re Winship, 397 U.S. 358, 361, 90 S.Ct. 1068, 1071, 25 L.Ed.2d 368, 373-374 (1970); State v. Gardner, 51 N.J. 444, 459 (1968). It has been said that the requirement is "bottomed on a fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free." In re Winship, supra, 397 U.S. at 372, 90 S.Ct. at 1077, 25 L.Ed.2d at 380. (Harlan, J., concurring). No one currently disputes the settled principle that *292 the State bears the burden of proving beyond a reasonable doubt each element of the offense charged including the requisite mental state. In the latter respect, the rule is derived from the common law concept that criminal sanctions will not be imposed upon a defendant unless there exists a "concurrence of an evil-meaning mind with an evil-doing hand." State v. Williams, 29 N.J. 27, 41 (1959).
While it is clear that "our society has willingly chosen to bear a substantial burden in order to protect the innocent," Patterson v. New York, 432 U.S. 197, 208, 97 S.Ct. 2319, 2326, 53 L.Ed.2d 281, 291 (1977), it is equally plain that the risk it must suffer is not without limits. The United States Supreme Court has "decline[d] to adopt as a constitutional imperative [the principle] ... that a State must disprove beyond a reasonable doubt every fact constituting any and all affirmative defenses related to the culpability of an accused." Id., 432 U.S. at 210, 97 S.Ct. at 2327, 53 L.Ed.2d at 292. Proof of the nonexistence of an affirmative defense has never been constitutionally compelled. In Leland v. Oregon, 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952), for example, the United States Supreme Court held that a state statute which placed upon the defendant the burden of proving insanity was not violative of due process. The question of insanity was said not to pertain to an element of the offense. See also State v. Lewis, 67 N.J. 47 (1975); State v. Cordasco, 2 N.J. 189 (1949); State v. Molnar, 133 N.J.L. 327 (E & A 1945); State v. Scelfo, 58 N.J. Super. 472 (App.Div. 1959), certif. den. 31 N.J. 555 (1960). In a somewhat similar vein, the Supreme Court more recently upheld the validity of a New York statute which required the defendant to prove by a preponderance of the evidence the affirmative defense of extreme emotional disturbance in order to reduce a murder charge to manslaughter. Patterson v. New York, supra, 432 U.S. at 206, 97 S.Ct. at 2325, 53 L.Ed.2d at 289. Since the statute did not alter the prosecution's obligation to prove every fact necessary to constitute the crime, it did not unconstitutionally shift the burden of proof. See State v. *293 Toscano, 74 N.J. 421, 443 (1977); State v. Rockholt, 186 N.J. Super. 539 (App.Div. 1982), aff'd 96 N.J. 570 (1984). In contrast, the Supreme Court in Mullaney v. Wilbur, supra, declared unconstitutional a Maine statute which placed upon the defendant the burden of proving by a preponderance of the evidence that the killing was committed in the heat of passion or sudden provocation in order to reduce the offense of murder to manslaughter. Although the statute was phrased in terms of an affirmative defense, as applied, it actually served to compel the defendant to disprove an element of the crime of murder. 421 U.S. at 686-687, 95 S.Ct. at 1883-84, 44 L.Ed.2d at 512. The common thread running through all of these decisions is that a state may constitutionally require the defense to bear the burden of persuasion with respect to a fact or group of facts either as an affirmative defense or as mitigation as long as the prosecution remains obliged to prove every element of the offense.
It is against this backdrop that we consider the constitutionality of N.J.S.A. 2C:4-2. Although the statute purports to establish an "affirmative defense," that thesis is highly questionable in light of our prior case law. The admissibility of evidence pertaining to mental or emotional illness as it bears upon the question of mens rea has had a checkered history. Earlier decisions were inconsistent and were so read by a majority of the United States Supreme Court in Fisher v. United States, 328 U.S. 463, 474, 66 S.Ct. 1318, 1324, 90 L.Ed. 1382, 1389 n. 12 (1946). Compare State v. Close, 106 N.J.L. 321, 324 (E & A 1930); State v. Schilling, 95 N.J.L. 145, 148 (E & A 1920); Wilson v. State, 60 N.J.L. 171, 184 (E & A 1897) with State v. Rodia, 132 N.J.L. 199 (E & A 1944); State v. Noel, 102 N.J.L. 659, 676 (E & A 1926); State v. Maioni, 78 N.J.L. 339, 341 (E & A 1909). The subject was substantially clarified in State v. DiPaolo, 34 N.J. 279, 294-297 (1961), cert. den. 368 U.S. 880, 82 S.Ct. 130, 7 L.Ed.2d 80 (1961). Noting that the issue had received uneven treatment, Chief Justice Weintraub wrote:

*294 The difficulty seems to be that the topic is sometimes explored under the label of `partial responsibility' or `diminished responsibility' or perhaps confused with some other concept intended to be so described. Both of those characterizations are misleading since they tend to connote an `affirmative defense' designed to defeat a case the State has otherwise established and thus to suggest the intrusion of an amendment to the established basis for criminal accountability. Actually the question is simply whether there shall be excluded evidence which merely denies the existence of facts which the State must prove to establish [the offense charged.] Id. 34 N.J. at 294.
* * * * * * * *
The three mental operations [necessary to establish murder] are matters of fact. The judiciary cannot bar evidence which rationally bears upon the factual inquiry the Legislature has ordered. The capacity of an individual ... to execute a homicidal design, or any deficiency in that capacity, may bear upon the question whether he did in fact did so act. Hence evidence of any defect, deficiency, trait, condition, or illness which rationally bears upon the question whether those mental operations did in fact occur must be accepted. Such evidence could be excluded only upon the thesis that it is too unreliable for the courtroom, a thesis which would not square with the universal acceptance of medical and lay testimony upon the larger issue whether there was a total lack of criminal responsibility. Id. at 295. (emphasis supplied).
See also State v. Sikora, 44 N.J. 453, 473 (1965). (Weintraub, C.J., concurring). Although State v. DiPaolo, supra, and its progeny, State v. Conforti, 53 N.J. 239, 246 (1969) and State v. Sikora, supra, pertained to the use of psychiatric testimony to contest the existence of premeditation, deliberation and wilfullness under our prior murder statute, the rationale obviously applies to all offenses requiring as an element of proof a particular state of mind. In any event, the Legislature plainly intended to codify the concept in enacting N.J.S.A. 2C:4-2. See Final Report of the New Jersey Law Revision Commission, Commentary to the New Jersey Penal Code, pp. 99-100 (1971). See also Weinhofen and Overholser, "Mental Disorder Affecting the Degree of Crime", 56 Yale L.J. 959 (1947). It is, thus, abundantly clear that the statute does not create an affirmative defense as that term is generally used. In short, the defense of diminished capacity is not designed to defeat a case the State has otherwise established. Rather, the term is a legal colloquialism referring to psychiatric or other evidence contesting the *295 State's thesis that the accused acted with the mental state required to be proven in order to convict.
So posited, the question remains whether the Legislature can, consistent with constitutional principles, place upon the defense the burden of establishing mental disease or defect. We conclude that the statute comports with due process. The identical issue was addressed by our Supreme Court in a somewhat related context in State v. Molnar, 81 N.J. 475 (1980). There, defendant, the acting warden of a prison, was convicted of perjury. The principal thrust of the prosecutor's case at trial was that the defendant had deliberately lied when he testified before the grand jury that he was not offered a bribe by an escaped prisoner. The defense conceded that defendant's testimony was untrue. Defendant claimed, however, that he was involved in an automobile accident prior to appearing before the grand jury. He asserted that he was suffering from amnesia and, thus, did not knowingly lie to the grand jury. In his instruction to the jury, the trial judge noted that the State was required to prove beyond a reasonable doubt that defendant knowingly testified falsely. Nevertheless, since the defense was premised upon the allegation that defendant suffered from a mental defect, amnesia, it bore the burden of establishing that underlying fact by a preponderance of the evidence. A divided Appellate Division reversed. 161 N.J. Super. 424 (App. Div. 1978). The majority concluded that "the amnesia evidence was not being received in support of an affirmative defense, that is, by way of confession and avoidance, or as a justification or excuse for conduct which would otherwise be criminal ... but to create a reasonable doubt concerning the existence of an essential element of the offenses with which he was charged and as to which the State, not he, bore the burden of proof." Id. at 444-445. (citations omitted).
The Supreme Court reversed in a unanimous decision. Initially, the Court noted that the defense of amnesia was not offered to establish defendant's insanity. State v. Molnar, supra 81 N.J. at 490. Although loss of memory claims had *296 generally been considered within the context of the defense of insanity, see State v. Risden, 56 N.J. 27 (1970); State v. Coleman, 46 N.J. 16 (1965), cert. den. 383 U.S. 950, 86 S.Ct. 1210, 16 L.Ed.2d 212 (1966); State v. Huff, 14 N.J. 240 (1954), such cases were distinguished. State v. Molnar, supra 81 N.J. at 490. The Court took pains to note that defendant's "sanity [was] not an issue" and, thus, the cases holding that the accused bore the burden of persuasion with respect to that issue were inapposite. Ibid. As posed by the Court, the essential factual question presented at trial was whether defendant "knew of the illicit scheme when he failed to report it and when he testified to the contrary before the grand jury." Id. at 491. While finding that the insanity cases were not applicable, the Court, nonetheless, upheld the trial judge's conclusion that defendant was obliged to prove the fact of amnesia by a preponderance of the evidence. Id. at 493. The Court noted that the claim of amnesia was a "fertile field" for abuse due to the "vagaries of human memory" and the fact that it is "present in some degree in everyone." Id. at 492. Such a defense could easily be contrived after the commission of a criminal act. Ibid. Therefore, the Court found nothing constitutionally impermissible in requiring the accused to establish the fact of amnesia as long as the State bore the ultimate burden of proving knowledge of falsity beyond a reasonable doubt. Id. at 491. The Court thus drew a distinction between the fact underlying the defense presented, amnesia, and the ultimate element required to be established by the State beyond a reasonable doubt, knowing falsity. Id. at 491. The Court noted that the defense of amnesia did "not necessarily refute [defendant's] knowledge of official corruption. Assuming he had established that his memory was usually deficient, it would remain open to question whether he retained a recollection of the specific facts which were the subject of official investigation." Ibid. The Court noted that "[e]ven suffering from amnesia, he may still have remembered the bribe offer." Ibid. The Court concluded that "the State need not disprove defendant's *297 amnesia beyond a reasonable doubt and Molnar's request to charge the State with that burden was properly denied". Ibid.
The same reasoning was applied by the Montana Supreme Court in upholding the constitutional validity of a statute almost identical to ours in State v. McKenzie, 177 Mont. 280, 581 P.2d 1205 (1978), vacated and remanded sub nom. McKenzie v. Montana, 443 U.S. 903, 99 S.Ct. 3094, 61 L.Ed.2d 871 (1979), aff'd on remand 186 Mont. 481, 608 P.2d 428 (Mont.Sup.Ct. 1980), cert. den. 449 U.S. 1050, 101 S.Ct. 626, 66 L.Ed.2d 507 (1980).[4] There, the Court noted that it was not unfair to impose upon the accused the obligation to prove mental disease or defect. Specifically, the Court stated that "[b]ecause psychiatric evaluation as to subtle gradations of mental impairment is highly subjective and not within the common experience of the layman juror, the State may in fairness require a defendant to convince the jury of his diminished capacity by a preponderance of the evidence." Id. 581 P.2d at 1233. Nevertheless, the Court emphasized that the State was obliged to prove the accused's criminal mental state beyond a reasonable doubt. *298 Ibid. Thus, the statute was held not to shift the State's burden of proving an essential element of the offense.[5]
We believe that these considerations are fully controlling here. We do not wish to denigrate the value of psychiatric testimony pertaining to gradations of mental impairment. We would be myopic, however, were we to fail to note the continuing controversy surrounding the defenses of insanity and diminished capacity. The lingering suspicion harbored by many is best evidenced by the fact that numerous jurisdictions have rejected diminished capacity as a defense. See Lee v. State, 265 Ala. 623, 93 So.2d 757 (1957); State v. Schantz, 98 Ariz. 200, 403 P.2d 521 (1965); Bates v. State, 386 A.2d 1139 (Del. 1978); Bethea v. United States, 365 A.2d 64 (D.C. 1976), cert. den. 433 U.S. 911, 97 S.Ct. 2979, 53 L.Ed.2d 1095 (1977); Zeigler v. State, 402 So.2d 365 (Fla. 1981), cert. den. 455 U.S. 1035, 102 S.Ct. 1739, 72 L.Ed.2d 153 (1982); Ezzell v. State, 88 So.2d 280 (Fla. 1956); State v. Murray, 375 So.2d 80 (La. 1979); Johnson v. State, 292 Md. 405, 439 A.2d 542 (1982); Armstead v. State, 227 Md. 73, 175 A.2d 24 (1961); State v. Bouwman, 328 N.W.2d 703 (Minn. 1982); State v. Wilcox, 70 Ohio St.2d 182, 436 N.E.2d 523 (1982); State v. Flint, 142 W. Va. 509, 96 S.E.2d 677 (1957); Sprague v. State, 52 Wis.2d 89, 187 N.W.2d 784 (1971). See also Muench v. Israel, 715 F.2d 1124 (7th Cir.1983), cert. den. ___ U.S. ___, 104 S.Ct. 2682, 81 L.Ed.2d *299 878 (1984). We are satisfied that the Legislature can constitutionally compel the defense to rebut the assumption of mental normalcy as long as the prosecution bears the burden of establishing the requisite state of criminal culpability beyond a reasonable doubt.[6] As described previously, the trial judge's instructions clearly apprised the jury of the State's obligation in that regard. We, thus, reject defendant's contention that N.J.S.A. 2C:4-2 deprived him of procedural and substantive due process.[7]

*300 II
We next turn to defendant's argument that retroactive application of N.J.S.A. 2C:4-2 violated the ex post facto prohibitions set forth in the Federal and State Constitutions. As originally enacted, the statute merely provided that evidence of a mental disease or defect was admissible when relevant to the issue of whether the accused harbored the requisite criminal state of mind required for a conviction. The statute further provided that "[i]n the absence of such evidence, it may be presumed that the defendant had no mental disease or defect which would negate a state of mind which is an element of the offense." Although this language is somewhat unclear, it would appear that it was merely designed to place upon the defendant the burden of producing evidence of mental impairment. On September 24, 1981, N.J.S.A. 2C:4-2 was amended, thereby imposing upon the defendant the burden of proving mental disease or defect by a preponderance of the evidence. Since the amendment was enacted after the criminal event, but before the trial, defendant claims that it should not have been applied retroactively. In response, the State contends that the amendment was merely procedural and did not affect defendant's substantive rights.
The prohibition against ex post facto laws "is designed to secure substantial personal rights against arbitrary and oppressive legislation...." State v. Davis, 175 N.J. Super. 130, 147 (App.Div. 1980), certif. den. 85 N.J. 136 (1980). The Constitution's drafters "sought to assure that individuals had fair warning of the impact of legislation and could rely on its meaning." State v. T.P.M., 189 N.J. Super. 360, 366 (App.Div. 1983). See also Weaver v. Graham, 450 U.S. 24, 28-29, 101 S.Ct. 960, 963-64, 67 L.Ed.2d 17 (1981); Dobbert v. Florida, 432 U.S. 282, 292, 97 S.Ct. 2290, 2297, 53 L.Ed.2d 344 (1977), *301 reh. den. 434 U.S. 882, 98 S.Ct. 246, 54 L.Ed.2d 166 (1977); Beazell v. Ohio, 269 U.S. 167, 169-170, 46 S.Ct. 68, 69, 70 L.Ed. 216 (1925). The clause "prohibits any law which in relation to the past offense or its punitive consequences, alters the situation of the offender to his disadvantage." State v. T.P.M., supra 189 N.J. Super. at 366-367. See also State v. Chapman, 187 N.J. Super. 474 (App.Div. 1982).
In several decisions, the United States Supreme Court has held that "no ex post facto violation occurs if the change effected is merely procedural, and does `not increase the punishment nor change the ingredients of the offense or the ultimate facts necessary to establish guilt.'" Weaver v. Graham, 450 U.S. 24, 29 n. 12, 101 S.Ct. 960, 964 n. 12, 67 L.Ed.2d 17, 23 n. 12 (1981) (quoting Hopt v. Utah, 110 U.S. 574, 590, 4 S.Ct. 202, 210, 28 L.Ed. 262 (1884)). A substantial question exists as to whether evidentiary rules are to be considered substantive or procedural for this purpose. Our Supreme Court in State v. Molnar, supra 81 N.J. at 488, held that "burdens of proof  those rules governing the degree of certainty the evidence must engender to warrant a given disposition by the trier of fact  are `procedural' matters within the meaning of N.J.S.A. 2C:1-1(c)(1)." The latter statute provides that in any case pending or initiated after the effective date of the Code involving a previously committed offense the procedural provisions are to apply. Hence, the Court held that the Code's provisions altering the burden of proof were to be given retroactive application to offenses committed prior to its enactment. Ibid. Although the Court had no occasion to consider the precise issue presented here, its holding is consistent with earlier pronouncements of the United States Supreme Court pertaining to the applicability of the ex post facto clause. In Beazell v. Ohio, supra, 269 U.S. at 170, 46 S.Ct. at 69, 70 L.Ed. at 217, for example, the Court stated that statutory alterations do not fall within the ex post facto ban if they pertain to the mode of trial or the rules of evidence, do not deprive the accused of a defense, and operate only in a limited manner and *302 insubstantial to his disadvantage. Similarly, in Hopt v. Utah, supra, a statute removing the disqualification of a certain class of people who may be witnesses was held not to fall within the ex post facto proscription. In Thompson v. Missouri, 171 U.S. 380, 18 S.Ct. 922, 43 L.Ed. 204 (1898), a statute changing the rules of evidence to allow testimony against an accused that was previously inadmissible was found to be constitutionally subject to retroactive application. In contrast, the Court in other decisions has alluded to the broad language of Calder v. Bull, 3 U.S. (3 Dall.) 386, 390, 1 L.Ed. 648 (1798)[8] and has given the ex post facto provision greater reign. See, e.g., Thompson v. Utah, 170 U.S. 343, 18 S.Ct. 620, 42 L.Ed. 1061 (1898); Kring v. Missouri, 107 U.S. 221, 2 S.Ct. 443, 27 L.Ed. 506 (1883); Cummings v. Missouri, 71 U.S. (4 Wall.) 277, 18 L.Ed. 356 (1866). The decisions of the lower federal courts are inconsistent with respect to the question. See, e.g., Government of Virgin Islands v. Civil, 591 F.2d 255, 259 (3rd Cir.1979) (repeal of corroboration statute reduces the amount of proof necessary for conviction and violates ex post facto prohibition); United States v. Henson, 486 F.2d 1292, 1304-1308 (D.C. Cir.1973) (statute eliminating trial judge's discretion in admitting prior criminal convictions violates ex post facto prohibition); United States v. Williams, 475 F.2d 355, 356 (D.C. Cir.1973) (statute shifting burden of proof to defendant as to insanity defense violates ex post facto prohibition); Parker v. United States, 235 F.2d 21, 22 (D.C. Cir.1956) (statute revoking physician's privilege could be applied retroactively).[9]
*303 We tend to believe that N.J.S.A. 2C:4-2 can be applied retroactively because it does not decrease the nature, amount or quality of the evidence the State must present in order to obtain a conviction. As noted previously, the prosecution remains obliged to prove the requisite culpability state beyond a reasonable doubt. To that extent, it cannot be said that the statute "alters the situation of the offender to his disadvantage." State v. T.P.M., supra 189 N.J. Super. at 366-367. We need not dwell on the subject, however. In light of the evident disparity of opinions among the courts regarding the applicability of the ex post facto clause to alterations in the rules of evidence, see Phillips v. Kentucky, supra, we prefer to premise our holding on a slightly different basis. We conclude that the amendment did not serve to affect a change or modification of our rules of evidence. As noted, State v. Molnar, supra, held that it was constitutionally permissible to require the defendant to prove the existence of a mental defect, there amnesia, by a preponderance of the evidence. That decision preceded the trial of this case. Although N.J.S.A. 2C:4-2 was originally silent with respect to the burden of proving mental impairment, the amendment did not change the law in that respect. The Supreme Court's holding in State v. Molnar, supra, was fully in force at the time of the commission of the offense. Neither the enactment of N.J.S.A. 2C:4-2 nor adoption of the subsequent amendment altered the Molnar holding. We, thus, reject defendant's claim that application of N.J.S.A. 2C:4-2 violated the ex post facto prohibition.

III
While a fugitive in Las Vegas, defendant wrote a lengthy letter to his aunt, Stephanie Humanik, detailing the events *304 surrounding the homicide. Upon receiving the letter, Ms. Humanik gave it to defendant's sister, Kathryn Blunt, "for safekeeping." Apparently, she was concerned that the police would search her home. On September 29, 1981, several police officers interviewed defendant's family in an attempt to learn of his whereabouts. During the course of those inquiries, Ms. Blunt was advised that it was unlawful to "harbor a fugitive" or to hinder a prosecution. Despite having received several letters from defendant, the family denied having any contact with him. Ms. Blunt asked to meet alone with the police officers. She subsequently took them to her home where she gave them the letter. The trial judge denied defendant's pretrial motion to suppress the evidence and the letter was subsequently admitted.
We are entirely satisfied that the letter was properly obtained by the police.[10] Defendant's reliance on State v. Johnson, 68 N.J. 349 (1975) is clearly misplaced. There, the police entered defendant's apartment ostensibly after his fiance consented. Departing from the United States Supreme Court's holding in Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), our Supreme Court concluded that New Jersey's constitution afforded broader protection than its federal counterpart. Specifically, the validity of the search was said to depend upon whether the consent was voluntary, an essential element of which was the knowledge of the right to refuse. State v. Johnson, supra 68 N.J. at 353-354.
Here, the issue of consent is not involved. Ms. Blunt's action in providing the police with defendant's letter was not directly instigated by the officers. Ms. Blunt never responded to the police officers' questions pertaining to defendant's *305 whereabouts. Rather, she chose to turn over the letter. In short, the officers' inquiries were not tantamount to a request for consent to search. See State v. McGivern, 167 N.J. Super. 86, 89-90 (App.Div. 1979). Nor can it fairly be said that the conduct of the police was coercive. The Humanik family was not required to speak to the police. Once they chose to do so, however, they were subject to the provisions of our statutes which preclude hindering the apprehension of a fugitive by suppressing evidence. See N.J.S.A. 2C:29-3. We are convinced that the police properly obtained the letter and that defendant's Fourth Amendment rights were not violated by its admission.

IV
Defendant's remaining arguments do not warrant extended discussion. They pertain to various evidentiary decisions of the trial judge. During the direct examination of the defense's psychiatrist, counsel sought to elicit testimony pertaining to a letter upon which the expert had relied in reaching his conclusion. The trial judge sustained the prosecutor's objection. We agree that the trial court erred in that respect.[11] It has long been the law that hearsay statements upon which an expert relies are admissible, not for establishing the truth of their contents, but to apprise the jury of the basis of the opinion reached. See, e.g., Tramutola v. Bortone, 63 N.J. 9, 15 (1973); State v. Lucas, 30 N.J. 37, 79 (1959); Dietzeman v. Peterson, 196 N.J. Super. 96, 101-102 (Law Div. 1984). Nevertheless, we are convinced that the error had no impact upon the jury. We note in that respect that the letter was ultimately admitted in evidence.
*306 So too, we agree that on several occasions the trial judge erroneously precluded the defense from presenting testimony pertaining to various oral statements which were not offered to prove the truth of their contents. Such statements constituted verbal acts. See, e.g., State v. Baldwin, 47 N.J. 379, 394 (1966); Ringwood Assoc's Ltd. v. Jack's of Route 23, 166 N.J. Super. 36, 43 (App.Div. 1979); Robinson v. Branch Brook Manor Apts., 101 N.J. Super. 117, 122 (App.Div. 1968), certif. den. 52 N.J. 487 (1968). Again, we are entirely satisfied that these minor errors in no sense prejudiced defendant's rights. We note in that regard that the evidence sought to be admitted was largely inconsequential in light of the factual mosaic elicited by the defense. As with error generally, the essential inquiry must be whether the trial judge's decisions prejudiced the defendant's rights. We are convinced from our careful review of the evidence that the errors noted, either singly or cumulatively, were not sufficiently grievous as to bring about an unjust result. Defendant was entitled to a fair trial, but not one that was error free.

V
Finally, we perceive no justifiable reason to disturb the sentence imposed. Contrary to defendant's assertion, the trial judge did not impose an extended term. As noted in State v. Serrone, 95 N.J. 23, 25-26 (1983), "[a] life [term] for murder is really an ordinary sentence." See also State v. MaGuire, 84 N.J. 508 (1980). Further, the sentence imposed was within statutory limits and fully satisfied the tripartite test set forth in State v. Roth, 95 N.J. 334 (1984). In our view, the trial judge's exercise of discretion was properly based upon findings of fact grounded in competent, reasonably credible evidence. So too, the court applied correct legal principles in exercising its discretion. Finally, the sentence imposed did not constitute such a clear error of judgment that it shocks the judicial conscience. State v. Whitaker, 79 N.J. 503, 512 (1979); State v. Leggeadrini, 75 N.J. 150, 157 (1977).

*307 VI
In sum, we have carefully considered defendant's arguments and are convinced that they are devoid of merit. Accordingly, the judgment of conviction is affirmed.
NOTES
[1] The statute reads as follows:

Evidence that the defendant suffered from a mental disease or defect is admissible whenever it is relevant to prove that the defendant did not have a state of mind which is an element of the offense. In the absence of such evidence, it may be presumed that the defendant had no mental disease or defect which would negate a state of mind which is an element of the offense. Mental disease or defect is an affirmative defense which must be proved by a preponderance of the evidence.
[2] U.S. Const., Art. I, § 10, cl. 1.
[3] N.J. Const., (1947), Art. IV, § VII, par. 3.
[4] Defendant accurately characterizes the procedural history of McKenzie as labored. The issue was first considered by the Montana Supreme Court in State v. McKenzie, 171 Mont. 278, 557 P.2d 1023 (1976). The United States Supreme Court granted certiorari, McKenzie v. Montana, 433 U.S. 905, 97 S.Ct. 2968, 53 L.Ed.2d 1089 (1977), vacated the judgment and remanded the cause for further consideration in light of Patterson v. New York, supra. On remand the Montana Supreme Court affirmed, 177 Mont. 280, 581 P.2d 1205 (1978). Subsequently, the Supreme Court granted certiorari, McKenzie v. Montana, 443 U.S. 903, 99 S.Ct. 3094, 61 L.Ed.2d 871 (1979), but this time remanded directing reconsideration in light of Sandstrom v. Montana, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). Again on remand, the conviction was affirmed. State v. McKenzie, 186 Mont. 481, 608 P.2d 428 (1980). The state court conceded that the jury instructions on rebuttable presumptions unconstitutionally shifted the burden of proof, but held that the error was harmless. Id. 608 P.2d at 457-479. Thereafter, the United States Supreme Court denied certiorari. McKenzie v. Montana, 449 U.S. 1050, 101 S.Ct. 626, 66 L.Ed.2d 507 (1980).
[5] We are aware that the Oregon Supreme Court reached a contrary conclusion in State v. Stockett, 278 Or. 637, 565 P.2d 739 (Sup.Ct. 1977). There, the Court held that a similarly worded statute unconstitutionally shifted the burden of proving one of the essential elements of the offense. We do not find the Stockett opinion to be persuasive, however, since no consideration was given to the distinction between the existence of a mental disease or defect and the ultimate fact to be proved. Stated somewhat differently, the Court construed the Oregon statute as requiring the defense to disprove the requisite mental state. As noted, our Supreme Court in State v. Molnar, supra, held that while the defense was required to establish the existence of a mental disease or defect, the State, nonetheless, bore the burden of proving the defendant's criminal state of mind.
[6] We note that although the defenses of insanity and diminished capacity are essentially different, they often overlap. Under the McNaughten rule, the defense of insanity is available where the "party accused was laboring under such a defect of reason from disease of the mind as not to know the nature and quality of the act he was doing, or, if he did know it, that he did not know what he was doing was wrong." State v. Lucas, 30 N.J. 37, 68 (1959). Obviously, one who, by virtue of a mental disease or defect, does not know the "nature and quality" of his act may well be so incapacitated as to be unable to form the requisite mental state to be guilty of an offense. In that event, both the defenses of diminished capacity and insanity are available. On the other hand, there are undoubtedly cases in which the offender has the capacity to harbor the requisite mental state, but is sufficiently impaired so as not to be able to understand that what he is doing is wrong. Plainly, the defense of diminished capacity is preferrable from the strategic standpoint of the defense. The consequences of a successful claim of insanity and diminished capacity are completely different. A person found to be not guilty by reason of insanity is not necessarily set free. Rather, he is subject to commitment under the provisions of N.J.S.A. 2C:4-8. See, e.g., State v. Krol, 68 N.J. 236 (1975); State v. Kyles, 166 N.J. Super. 343 (App.Div. 1979). There is no comparable restraint upon the freedom of an individual who is found not guilty because the trier of fact concluded that there existed a reasonable doubt as to the actor's purpose or knowledge. There can be no question that such an individual may well pose a substantial danger to the public. In all likelihood, his condition is unlike that produced by intoxication, which is only temporary. Nevertheless, our law permits the offender to go free despite the social menace that he presents.
[7] We also reject defendant's argument that the trial judge erroneously shifted the burden of proof when he advised the jury that use of a firearm under some circumstances can support the inference that the accused purposely or knowingly caused the decedent's death. Under the trial judge's instructions, the jury was free to reject that permissible inference. See United States v. United States Gypsum Co., 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978). See also State v. Humphreys, 54 N.J. 406, 414 (1969); State v. Corby, 28 N.J. 106, 110 (1958); State v. McCandless, 190 N.J. Super. 75, 82-83 (App.Div. 1983).
[8] "Every law that alters the legal rules of evidence, and requires less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender is ex post facto."
[9] Recently, Justices White, Brennan and Powell joined in a dissenting opinion in which they registered their strong objection to the Court's refusal to grant certiorari in Phillips v. Kentucky, ___ U.S. ___, 104 S.Ct. 1427, 79 L.Ed.2d 751 (1984). There, the Kentucky Supreme Court held that a statute abrogating the corroboration doctrine could be retroactively applied consistent with the ex post facto prohibition. See Murphy v. Commonwealth, 652 S.W.2d 69 (Ky.Sup. Ct. 1983), and Phillips v. Commonwealth, 655 S.W.2d 6 (Ky.Sup.Ct. 1983). In their dissenting opinion, the three Justices emphasized the "evident confusion among lower courts concerning the application of the Ex Post Facto clause to changes in rules of evidence." ___ U.S. at ___, 104 S.Ct. at 1428, 79 L.Ed.2d at 752.
[10] Since the State does not challenge defendant's standing, we have no occasion to address the question whether defendant had a sufficient proprietary, possessory or participatory interest in the letter seized. See Brown v. United States, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973); State v. Alston, 88 N.J. 211, 228 (1981).
[11] Evid.R. 56(2) presently provides that "[t]he facts or data ... upon which an expert bases an opinion may be those ... made known to him ... before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions ... upon the subject, the facts or data need not be admissible in evidence." This rule went into effect after the trial.