210 N.J. Super. 442 (1986)
510 A.2d 80
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
ROBERT A. BREAKIRON, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued November 7, 1985.
Decided May 22, 1986.
*445 Before Judges FRITZ, BRODY and BAIME.
Richard John Baldi, Assistant Deputy Public Defender, argued the cause for appellant (Thomas S. Smith, Jr., Acting Public Defender, attorney; Blanca Rodriguez Cruz, Assistant Deputy Public Defender, of counsel and on the brief).
Carol M. Henderson, Deputy Attorney General, argued the cause for respondent (Irwin I. Kimmelman, Attorney General of New Jersey, attorney; Carol M. Henderson, of counsel and on the brief).
The opinion of the court was delivered by BRODY, J.A.D.
Defendant strangled Theresa Caizza with a knotted towel for several minutes until she died from asphyxia, a lack of oxygen in her body tissues. The couple had been living together for four months and were about to be married. A jury rejected defendant's insanity defense and found him guilty of purposeful or knowing murder (N.J.S.A. 2C:11-3(a)(1) or (2)) and other crimes related to his flight: second-degree kidnapping of the victim's three-year-old daughter (N.J.S.A. 2C:13-1(b)(1)), third-degree burglary of the home of the victim's mother and stepfather (N.J.S.A. 2C:18-2) and third-degree theft of the mother's and stepfather's car (N.J.S.A. 2C:20-3(a)). The trial judge imposed concurrent prison terms of 30 years without parole for the murder, 7 years for the kidnapping, 4 years for the burglary and 4 years for the theft. The main issue raised on this appeal is whether the trial judge erred in refusing to submit to the jury the defense of diminished capacity (N.J.S.A. 2C:4-2). We conclude that his ruling was correct, but not for the reason he gave.
Two psychiatrists testified, one for each side. Dr. Seymour Kuvin testified that defendant suffered from schizophrenia, a mental disease that Dr. Kuvin believed rendered defendant unable to "formulate an intent to knowingly or willfully kill *446 Theresa Caizza" and unable to "understand the nature and quality of his acts." Dr. Steven Simring testified in rebuttal for the State. In his opinion, defendant did not suffer from schizophrenia because he had never experienced delusions or hallucinations which are essential symptoms of the disease. He concluded that defendant suffered from an "antisocial personality disorder" that did not prevent him from acting purposefully or knowingly or from understanding the nature and quality of what he was doing or that it was wrong. Dr. Simring testified that defendant had the requisite state of mind to commit murder. He concluded that the fatal act was "impulsive and that it was angry, that it was poorly thought out."
The trial judge refused to charge "diminished capacity" as a defense because he believed that the defense was no longer available under the Code. Before adoption of the Code, a murder was presumed to be in the second degree. The State had the burden of proving certain facts to elevate the crime to murder in the first degree. State v. Williams, 29 N.J. 27, 44 (1959). Specifically, the State had to prove that the killing was "willful, deliberate and premeditated." N.J.S.A. 2A:113-2. Using the labels "partial responsibility" or "diminished capacity," courts, before adoption of the Code, admitted "evidence of any defect, deficiency, trait, condition, or illness which rationally bears upon the question whether those mental operations[, willfulness, deliberation and premeditation,] did in fact occur...." State v. DiPaolo, 34 N.J. 279, 295 (1961), cert. den., 368 U.S. 880, 82 S.Ct. 130, 7 L.Ed.2d 80 (1961). (Emphasis in original.) If the homicide was a murder, but the evidence of "diminished capacity" raised a reasonable doubt as to whether the defendant's conduct was willful, deliberate and premeditated, the defendant could only be found guilty of second-degree murder.
The trial judge correctly concluded that the Code has eliminated that use of the "diminished capacity" concept. However, N.J.S.A. 2C:4-2 (the statute) preserves the concept in a somewhat different form. As first adopted the statute provided:

*447 2C:4-2 Evidence of Mental Disease or Defect Admissible When Relevant to Element of the Offense.
a. Evidence that the defendant suffered from a mental disease or defect is admissible whenever it is relevant to prove that the defendant did not have a state of mind which is an element of the offense.
b. Whenever evidence is admitted under subsection a. of this section, the prosecution may thereafter offer evidence in rebuttal. [L. 1978, c. 95]
The statute made admissible evidence of a defendant's mental disease or defect to negate the culpable mental state that is an element of any offense. "Diminished capacity" was no longer limited to negating the mental state of only first-degree murder.
Before the statute became effective, however, the Legislature amended it to read:
2C:4-2 Evidence of Mental Disease or Defect Admissible When Relevant to Element of the Offense.
Evidence that the defendant suffered from a mental disease or defect is admissible whenever it is relevant to prove that the defendant did not have a state of mind which is an element of the offense. In the absence of such evidence, it may be presumed that the defendant had no mental disease or defect which would negate a state of mind which is an element of the offense. [L. 1979, c. 178, § 11B]
As amended, the statute made clear that the State did not have to prove the absence of "diminished capacity" unless evidence was produced demonstrating that the defendant had a "mental disease or defect which would negate a state of mind which is an element of the offense." In effect, the amended statute established "diminished capacity" as an affirmative defense because, like defenses expressly designated "affirmative" in the Code, "diminished capacity" did not have to be disproved by the State "unless and until there is evidence supporting such defense." N.J.S.A. 2C:1-13(b)(1). The State was not required to overcome "diminished capacity" with proof beyond a reasonable doubt until the trial judge determined that the defense found some support in the evidence. See State v. Kelly, 97 N.J. 178, 200 (1984).
The statute arrived at its present form with the adoption of L. 1981, c. 290, § 8, (the 1981 amendment) which added the following sentence:

*448 Mental disease or defect is an affirmative defense which must be proved by a preponderance of the evidence.
By characterizing "diminished capacity" as an affirmative defense, the 1981 amendment added nothing. But by requiring that the "diminished capacity" defense "be proved by a preponderance of the evidence," the Legislature made the defense less available than when it was simply an affirmative defense that would be raised by the production of any evidence.
The State is constitutionally compelled to bear the burden of proving every element of an offense beyond a reasonable doubt. In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368, 375 (1970); State v. Brown, 80 N.J. 587, 592-593 (1979). That mandate is repeated in N.J.S.A. 2C:1-13(a). N.J.S.A. 2C:1-13(b)(2) provides, however, that the requirement that the State prove an element of the offense beyond a reasonable doubt does not "[a]pply to any defense which the code or another statute requires the defendant to prove by a preponderance of the evidence or such other standard as specified in this code." The Criminal Law Revision Commission report in commenting on this provision expressed "doubt as to the wisdom and, perhaps, the propriety of a provision which switches the burden of persuasion" to a defendant "where we are dealing with an element of the offense." II Final Report of the New Jersey Criminal Law Revision Commission: Commentary at 36-37 (1971).
If N.J.S.A. 2C:4-2 were to mean that a defendant has the burden of persuading the trier of fact that he had a mental disease or defect that prevented him from having the mental state which is an element of the offense charged, the statute may be unconstitutional because it would relieve the State of its burden to prove one of the elements of the offense beyond a reasonable doubt. The statute, however, does not have that meaning. The State need not overcome a "diminished capacity" defense until evidence of that defense is admitted. The effect of the statute is to render such evidence admissible only after *449 the trial judge has been persuaded by a preponderance of the evidence that the defense is sound.
The Legislature enacted the amendment because it was concerned that unlike evidence of the usual affirmative defenses, evidence of "diminished capacity" frequently takes the form of a psychiatric opinion that is not generally shared by experts and is not designed to meet the statutory test of criminal responsibility. The nature of the mind is still so little understood that a psychiatric opinion, honestly held, is usually available to prove the presence of mental disease or defect whenever a defendant's conduct is extraordinarily deviant. Indeed, the ease with which "diminished capacity" can be raised has led many states to reject the defense. See cases collected in State v. Humanik, 199 N.J. Super. 283, 298-299 (App.Div. 1985), certif. den. 101 N.J. 266 (1985).
We therefore hold that N.J.S.A. 2C:4-2 requires the trial judge to determine whether the evidence of "diminished capacity" is of sufficient substance to be admissible. The judge, not the jury, must be persuaded by a preponderance of the evidence that the defendant suffered from a "mental disease or defect which would negate a state of mind which is an element of the offense." If the judge is so persuaded, the evidence is admissible and the State must then overcome it at trial beyond a reasonable doubt in order to establish the "state of mind which is an element of the offense."
The language of the statute and its legislative history support our holding. From its first version, the statute has unvaryingly spoken in terms of the admissibility of evidence:
Evidence that the defendant suffered from a mental disease or defect is admissible whenever it is relevant to prove that the defendant did not have a state of mind which is an element of the offense.
That language gives the statute its character as a rule of evidence as well as a rule of substantive law. The 1981 amendment thus places on the defendant the burden of establishing the admissibility of the evidence, not the burden of persuading the trier of fact to believe it.
*450 The sponsor's statement to the 1981 amendment states that the amendment "provides that evidence of mental disease or defect must be established by the defendant by a preponderance of the evidence." (Emphasis added.) That is, the amendment provides for establishing the admissibility of "diminished capacity" evidence, not for how that evidence, if admitted, is to be considered by the trier of fact.
An interpretation of the statute that places on a defendant the burden of proving the defense of "diminished capacity" to a jury by a preponderance of the evidence, not only would bring into question its constitutionality but would produce an impractical result. It is impractical to expect a jury to perform their function intelligently when instructed that they must first decide whether they have been persuaded by a preponderance of the evidence that the defendant did not have the offense's culpable state of mind because of mental disease or defect, and, if they are not so persuaded, they must then be persuaded beyond a reasonable doubt that the defendant did have the culpable state of mind in order to convict him. The judge would have to instruct the jury that if the defendant fails to convince them by a preponderance of the evidence of the "diminished capacity" defense, they must disregard any reasonable doubt that evidence raised concerning his culpable state of mind when considering whether the State has proved that he had that culpable state of mind beyond a reasonable doubt. We do not believe that the Legislature intended that juries be required to make such a fine distinction.
In another context the Supreme Court has recognized that while a fine legal distinction can be made in defining negligence depending upon whether injury resulted to the negligent party or to others, the distinction must be ignored:
... [T]o hold otherwise would further complicate an already difficult area of tort law. The practicalities of the situation weigh heavily in favor of a single standard. [Goss v. Allen, 70 N.J. 442, 448 (1976).]
*451 The "practicalities" here include the limited ability of jurors to deal with a fine legal distinction that appears to raise a hopeless contradiction regarding who has the burden of persuasion.
It is not unusual in the trial of criminal cases for a judge to conduct a hearing out of the jury's presence, pursuant to Evid.R. 8(1), in the course of which he must make findings of fact to establish the admissibility of evidence. Miranda and Wade hearings are commonplace. Some other examples may be found in State v. Kelly, 61 N.J. 283, 294 (1972) (admissibility of confession defendant claims he gave involuntarily); State v. Moore, 158 N.J. Super. 68 (App.Div. 1978) (admissibility of business entries); State v. Sands, 138 N.J. Super. 103 (App.Div. 1975), aff'd, 76 N.J. 127 (1978) (admissibility of an "excited utterance"); State v. Phelps, 187 N.J. Super. 364 (App.Div. 1983), aff'd, 96 N.J. 500 (1984) (admissibility of the statement of an alleged co-conspirator); State v. Driver, 38 N.J. 255, 287-288 (1962) (admissibility of sound recordings) and State v. Wilson, 158 N.J.Super 1 (App.Div. 1978), certif. den., 79 N.J. 473 (1978) (admissibility of "other crimes" evidence).
Because the purpose of the hearing will be to test the defendant's trial evidence, the defendant should not be permitted to testify at the hearing if he will not testify at trial. In fairness to the defendant, the hearing should therefore be conducted after the State has rested so that he will have a sufficient opportunity to decide whether to testify. Where appropriate, the judge should encourage the parties to rely on the reports of experts in order to expedite the hearing. If the judge rules that the evidence is admissible, the trial will then proceed as would any trial where an affirmative defense has been raised in the evidence; that is, the evidence will be admitted without comment to the jury by the judge and the judge will include in his charge an instruction that the State must prove beyond a reasonable doubt that the defendant did not have a mental disease or defect that prevented him from *452 having the culpable state of mind which is an element of the offense.
In his dissent our colleague adheres to the view he expressed in State v. Humanik, 199 N.J. Super. 283 (App.Div. 1985), certif. den. 101 N.J. 266 (1985), that the statute requires a defendant to persuade the trier of fact by a preponderance of the evidence only that he suffered from a mental disease or defect and, if the defendant satisfies that burden, the State then has the usual burden of proving beyond a reasonable doubt that the mental disease or defect did not prevent the defendant from having the mental state which is an element of the offense. In our opinion that interpretation fails to recognize the Legislature's expressed intent to place upon the defendant the burden of proving not only that he had a mental disease or defect but that the disease or defect prevented him from having the mental state which is an element of the offense. The statute provides in part:
Evidence that the defendant suffered from a mental disease or defect is admissible whenever it is relevant to prove that the defendant did not have a state of mind which is an element of the offense . .. Mental disease or defect is an affirmative defense which must be proved by a preponderance of the evidence. [N.J.S.A. 2C:4-2] (Emphasis added.)
As we previously noted, the Code expressly states that the State's obligation to prove every element of an offense beyond a reasonable doubt does not "[a]pply to any defense which the code or another statute requires the defendant to prove by a preponderance of the evidence...." N.J.S.A. 2C:1-13(b)(2). Diminished capacity is plainly such an affirmative defense. For the defense to prevail, a defendant must prove more than that he suffered from some mental disease or defect. He must also prove that his condition negated the state of mind which is an element of the offense. The dissent relies on the common-law formulation of the "diminished capacity" defense as defined in State v. Molnar, 81 N.J. 475 (1980). That case, however, was pre-Code. The Supreme Court was not concerned, as we are, with the meaning of the statute.
*453 The problem presented to us cannot be resolved by ignoring the Legislature's clear intent to place upon a defendant the burden of proving the diminished capacity defense by a preponderance of the evidence. What is debatable is whether the Legislature intended that a defendant discharge that burden before the ultimate trier of fact or before the trial judge at a Rule 8 hearing. For the reasons expressed herein, we have concluded that the 1981 amendment requires a defendant to discharge that burden at a Rule 8 hearing as a condition to the admission of evidence of the defense.
We need not remand. The judge did not exclude the "diminished capacity" defense until after both sides had submitted all their evidence. We are therefore able to evaluate the evidence on this point in the exercise of our original jurisdiction pursuant to R. 2:10-5, particularly because the demeanor of the witnesses is not a factor in this case: defendant did not testify and we will assume that the demeanor of his expert was that of a credible witness. We are not persuaded, however, by the content of that expert's testimony.
We make the following findings. Defendant was almost 23 years old when he killed Ms. Caizza. His parents divorced before he was born and he never knew his father. Shortly after defendant's birth, his mother placed him with her parents who lived in Pennsylvania. Several years after she remarried, when defendant was five, his mother took him back to live in Maryland with her, her second husband and their two-year-old daughter. Defendant, however, had become attached to his grandparents and did not want to leave them. He soon resented his stepfather and became jealous of his half-sister.
These tensions, not particularly unusual or unexpected in themselves, became unbearable because of an extreme personality clash between defendant and his stepfather. From early childhood defendant was an aggressive, hyperactive and meanspirited child who through outbursts of temper and other forms of manipulation insisted on having his way. His stepfather was *454 a heavy-handed, rigid perfectionist. Several times defendant fled from his parents to resume living with his grandparents. When he was returned home, his stepfather sometimes beat him.
Defendant's disruptive behavior had caused continuing problems with school authorities from his earliest years. By the time he was 12 years old he had already begun to abuse drugs and thereafter drug abuse became a constant affliction in his life. Increasing friction at home caused him to spend longer intervals with his grandparents. When he was 12 years old they enrolled him as an outpatient in a local community health center in Pennsylvania because of his temper, threats and assaultive behavior. He was treated there intermittently during the next eight years when he was living with his grandparents. The "final diagnosis" of the center, entered by a social worker in 1980, was "anti-social personality."
From December 1975 to April 1977, when defendant was 15 and 16 years old, he was a resident at a mental health hospital in Maryland where his parents lived. They brought him there because they were unable to cope with his drug abuse. Matters had come to a head when he almost killed himself with an overdose. The year and a half at the hospital was tempestuous, marked by defendant's bullying, assaultive and threatening behavior, "elopements," thefts and a period in jail after he was caught eloping from the institution in an employee's car that he had stolen.
When he first entered the hospital, defendant was given a verbal psychiatric test. Its results persuaded the hospital staff that his "thinking ... may present ... some schizoid tendencies." Thereafter the periodic reports of defendant's progress at the hospital included "latent schizophrenia" among the diagnoses. That condition is no longer a recognized category of mental disease or defect by the American Psychiatric Association, although it was at the time of defendant's hospitalization. It was then defined in the Diagnostic and Statistical Manual of *455 the American Psychiatric Association, 2nd Ed., (DSM 2) as a condition in which the patient has "clear symptoms of schizophrenia but no history of a psychotic schizophrenic episode."
There is no evidence in the extensive records of the Maryland hospitalization that defendant exhibited psychotic behavior during his stay. Also, the hospital never noted that he suffered from delusions or hallucinations. An excerpt from the September 22, 1976 entry in his hospital record is typical of what the staff thought of his behavior:
Robert this week was very up and down. Affect included range from tough guy to cry baby, from ladies['] man to loner. He has been very hostile, including having gotten into a fistfight this week. He is aware that he may be needing to go to court very soon, and he is very anxious about this ... Robert is keenly aware of his manipulations. Clearly and completely confront him on the spot when he is seen to be manipulating.
The last and only other mental institution that treated defendant was a hospital in Pennsylvania where he committed himself for three days at the age of 19. He reported to the hospital staff that he was fearful of "facing 22 years for driving a stolen car, possession of firearm (unregistered) and possession of a quantity of `coke.'" Shortly before his admission he had threatened his grandparents' lives, torn up their kitchen and his bedroom, and superficially cut his arm. A hospital report states that defendant was given drugs "to help control anger" and released three days after his admission. The final diagnosis was "antisocial personality." The records of that hospital expressly state that defendant did not experience "any delusions or any hallucinations."
Defendant's post-homicide statements to the police, his uncle and the two expert witnesses provide the only evidence of his later activities. The probative value of his extensive statements to the experts depends "upon whether there is, from all the evidence in the case, independent proof of the statement made by the accused." State v. Lucas, 30 N.J. 37, 79-80 (1959). With that limitation in mind we further find that after he received a probationary sentence for the motor vehicle theft charges that he feared when he had signed himself into the *456 Pennsylvania hospital, defendant "drifted" around the country. During that time he was convicted of a credit card offense in Nevada.
Eventually he made his way back to New Jersey and moved in with Ms. Caizza and her daughter in the latter part of 1982. They planned to be married on February 26, 1983. Defendant was ambivalent about the marriage. Despite the affection he showed for his fiancee and her daughter, in a fit of violent jealousy he once assaulted Ms. Caizza and threatened to kill her and her former boyfriend.
The only description we have of the homicide is found in defendant's hearsay statements. In a written statement that he gave the police six weeks after the killing, he stated that when he entered the apartment where they lived he heard the baby crying
and Terry was upset. She was yelling at me and the baby as soon as I got in the door. She was in the kitchen wiping down the sink or washing dishes or something. She came into the living room. I had my back to her picking up a cigarette and getting ready to light it. She grabbed me by the arm, spun me around and said that I was ignoring her, not listening to her. She was very close to my face and spitting while she was talking and I reached up and took a towel, a dish towel that had been around her neck and I took hold of it and I just started squeezing. It was like I wasn't even doing it....
Defendant's uncle, who lived in Florida, testified that several days after the homicide defendant described the event to him. Defendant told him that
it seemed like it happened to someone else. He couldn't quite place how the whole incident happened to him ... all he can remember is her laying on the floor and the baby was there.
....
He says that Theresa was crying about the baby. She didn't want to do something or maintain the baby. The baby was getting on her nerves and she come up to him and she kept babbling about it and she come up to his face and scratched him the length of his face and he said then he just went off the deep end. He really didn't know what happened and that is when he said the next thing he knew, she was laying on the floor. He said he didn't know which way to turn. The only thing he wanted to do was get away.
*457 Almost six weeks after the homicide defendant surrendered to a Florida police officer through the intercession of his uncle. The officer testified that defendant told him that
Theresa was arguing with him over [her daughter] and she was tired of the little girl crying all of the time and she was stuck in the house with her and they got into a fight, an argument. I don't know which word he used, and the next thing he knew he said he snapped and he saw himself choking her.
Immediately after the homicide, defendant collected his clothes and took Ms. Caizza's engagement ring from her finger. He took from her purse $240 and the keys to her mother's home. Before leaving the apartment with the baby, defendant removed a part from the telephone so that it could not be used. Knowing that the victim's mother and stepfather were on vacation, he drove to their home in Ms. Caizza's defective car, unlawfully entered the home, took the key to their car and used it to begin his long flight with the baby. Several days later defendant left the baby with his uncle in Florida and then hitchhiked around the country for several weeks before returning to Florida to surrender.
Dr. Kuvin, defendant's expert, testified that defendant strangled Ms. Caizza during a schizophrenic episode. It was his opinion that the schizophrenia negated a purposeful or knowing state of mind, elements of the murder with which defendant was charged. According to Dr. Kuvin, immediately after strangling Ms. Caizza to death, the schizophrenic episode ceased thereby permitting defendant to commit the thefts and commence his flight.
Defendant had a purposeful state of mind if it was his conscious object to kill Ms. Caizza, and had a knowing state of mind if he was aware that he was strangling her and that it was practically certain that she would die from the strangulation. N.J.S.A. 2C:2-2(b)(1) and (2).
Our ultimate finding is that defendant was not in the grip of a schizophrenic episode during the several minutes that he tightened the knotted towel around Ms. Caizza's throat. The Diagnostic and Statistical Manual of the American Psychiatric *458 Association, 3rd Ed., (DSM 3), the current manual, defines schizophrenia by listing six sets of symptoms, any of which constitutes the mental disease. All six include having some form of delusions or hallucinations. The only delusions or hallucinations that defendant may ever have had were induced by drug abuse. Even if we credit defendant's hearsay statements, made days after the homicide, that he felt detached from committing the fatal act, we find that Dr. Simring correctly characterized that feeling as a normal defense mechanism, adopted after the fact, that enables a person to live with a terrible event.
We reject Dr. Kuvin's conclusory opinion that defendant experienced a schizophrenic episode that exactly coincided with the time it took to strangle Ms. Caizza to death. Dr. Simring's testimony on the point is more convincing:
Q. In your opinion, how long would schizophrenic episode of the proportions described by Mr. Breakiron last?
A. An illness like schizophrenia, which is a common illness, which, as I have testified, can be marked by flare-ups, exacerbations and periods of remission or be in control, these flare-ups, these psychotic or exacerbation episodes, they usually build up over a period of weeks or months. They are often precipitated by anticipatory signs. The patient will become restless, anxious, withdrawn, neglect personal hygiene. This occurs over a period of time and then gradually he will begin to have strange and bizarre beliefs. He will begin to think that his thoughts or his body is being controlled. He will begin to hear voices. There will be increasing complaints of voices, social withdrawal, talking to one's self, isolation. Without treatment, the period of acute schizophrenia usually lasts some four to six months. With treatment, even with the best treatment, it usually is at least a few weeks before the schizophrenic symptoms are under control.
THE COURT: Could it be triggered by something and be of brief duration?
THE WITNESS: No.
In sum, we conclude that the evidence falls far short of establishing the defense of "diminished capacity" by a preponderance of the evidence. For that reason the trial judge did not err in refusing to submit the defense to the jury.
During their deliberations, the jury asked a question which the judge repeated for the record as follows:

*459 A note for the record, if you will, received from the jury at 11:14 was a note which says, "Please give us Dr. Simring's definitions of schizophrenia given on the second day, he read it from DSM dot dot dot Volume 2." They seem to say it's either Volume 2 or question mark....
Dr. Simring's testimony extended over two days. On the first day he read the definition of schizophrenia contained in DSM 3. That is the definition which lists six sets of symptoms. We suspect that that is what the jury wanted to have read back because they wanted to be sure, in considering the insanity defense, that each set included having some form of delusions or hallucinations. By interpreting "Volume?" as "Volume 2" the trial judge and the attorneys assumed that the jury was interested in the DSM 2 definition of "latent schizophrenia" rather than the six DSM 3 "definitions of schizophrenia" (emphasis added) for which they had asked.
Acting on that misunderstanding, the court instructed the reporter to review her notes of Dr. Simring's second day of testimony. She found nothing that matched the jury's request as it was understood by the trial judge and the attorneys. The reporter then began to search her notes of the first day's testimony. There she found the following testimony in which Dr. Simring defined "latent schizophrenia":
Latent schizophrenia is a diagnosis which no longer exists for I think good reason. It was a diagnosis in the Second Edition in the DSM-2. Latent means hidden, it meant that although there was no evidence of schizophrenia, it was the suspicion usually in a young person that because the behavior consists and is uncontrollable, maybe sometime in life we won't be surprised if there would be a schizophrenic reaction later on. But latent schizophrenia by definition does not include schizophrenic symptoms. It does not include voices, delusions and the like.
The judge and the attorneys appeared to agree that this was the testimony the jury had requested and it was read to the jury. The judge denied a motion by defendant's attorney to read back related portions of Dr. Kuvin's testimony and to read from the Manual the DSM 2 definition of "latent schizophrenia."
Before instructing the jury to resume their deliberations, the judge made it clear to them that the portion of testimony that *460 was read back had not been given on the second day and perhaps was not the portion that they had requested. He told them that if they wanted to hear some other portion, they should resubmit their question with more specificity. The jury submitted no further questions.
Had the court reporter read on, she would have found that later during the first day of his testimony, in response to the judge's request to define "latent," Dr. Simring asked if he could read the definition from DSM 2. With the judge's permission he then read the definition of "latent schizophrenia" from DSM 2:
This category is for patients having clear symptoms of schizophrenia but no history of a psychotic schizophrenic episode....
The judge and the attorneys had forgotten that portion of Dr. Simring's testimony and it was not read back to the jury. Defendant now contends that the judge committed plain error in not reading back that portion of the witness's testimony.
It was not entirely clear from the question, what testimony the jury wanted read back. Their failure to respond to the judge's offer to read back any other portion of Dr. Simring's testimony suggests that the jury was either satisfied with the testimony the court read back or that they changed their minds and no longer cared to hear what they originally had requested. A judge is not obliged to read back testimony originally requested when the jury no longer wants to hear it. State v. Garrigan, 126 N.J. Super. 442, 446-447 (App.Div. 1973), aff'd, 64 N.J. 287 (1974). In any case, the judge was not obliged to review Dr. Simring's entire testimony in search of what everyone at the time believed had already been found.
Defendant's remaining points can be disposed of with dispatch. The trial judge properly admitted the testimony of Ms. Caizza's friend who related that he had witnessed defendant's angry assault upon Ms. Caizza and his threat to kill her and her former boyfriend. This evidence was admissible to prove jealousy as a motive for the homicide and to dispel the *461 impression created by defendant's evidence that a purposeful or knowing murder was inconsistent with the couple's loving relationship. Evid.R. 55.
The trial judge correctly ruled that there was no basis in the evidence for permitting the jury to consider aggravated manslaughter and reckless manslaughter as lesser included offenses. See State v. Hollander, 201 N.J. Super. 453, 474-475 (App.Div. 1985), certif. den. 101 N.J. 335 (1985).
The judge properly excluded testimony of defendant's grandmother and uncle that would have described defendant's behavior many years before the homicide and would have included their opinion of his mental state at that earlier time. The offered description of defendant's conduct as a child and of the turbulent relationship he had with his parents was fully documented in the hospital records that were in evidence. Those records also contained the opinions of medical doctors concerning his mental state. Defendant's grandmother and uncle had told the substance of their offered testimony to Dr. Kuvin and he repeated in his testimony what they had told him. These matters were not contested and the witnesses' testimony would have added nothing significant. See State v. Monahan, 16 N.J. 83, 91-92 (1954), cert. den., 348 U.S. 889, 75 S.Ct. 210, 99 L.Ed. 698 (1954).
Finally, defendant contends that he did not kidnap Ms. Caizza's daughter because after killing her mother he became responsible for the child's general supervision until he left her with his uncle in Florida. He also contends that even if taking the child was an "unlawful removal" from her residence, it was not done "[t]o facilitate commission of any crime or flight therefrom; ...."
N.J.S.A. 2C:13-1(b)(1) provides in relevant part:
A person is guilty of kidnapping if he unlawfully removes another from his place of residence ... [t]o facilitate commission of any crime or flight thereafter;
N.J.S.A. 2C:13-1(d) provides in relevant part:
A removal ... is unlawful within the meaning of this section ... in the case of a person who is under the age of 14 or is incompetent, if it is accomplished *462 without the consent of a parent, guardian or other person responsible for general supervision of his welfare.
We reject as preposterous defendant's argument that by killing the child's mother, he thereby became "responsible for general supervision of [the child's] welfare" and was therefore legally entitled to take her with him on his perilous flight from apprehension. Defendant knew that the child had close family living nearby. Ms. Caizza's body was found several days after the homicide as a result of her sister's concern. Although there was evidence that defendant cared for the child, there was also evidence from which the jury could have reasonably concluded beyond a reasonable doubt that defendant took the child with him because leaving her behind or turning her over to relatives or the authorities would have disclosed the crime and prevented his flight. See State v. Reyes, 50 N.J. 454, 459 (1967).
Affirmed.
BAIME, J.A.D. (dissenting).
The issue presented in this appeal is the availability of the defense of diminished capacity. Defendant, who has an extensive history of mental illness, was deprived of the right to present that defense to the jury and was convicted of murder. The majority countenances that result by construing N.J.S.A. 2C:4-2 as requiring the trial judge to determine whether the evidence of diminished capacity is of sufficient substance to be admissible. Under the majority's construction of the statute, the judge must be persuaded by a preponderance of the evidence that the defendant suffered from a mental disease or defect which prevented him from harboring the requisite culpability state necessary to convict. Only then is the question of diminished capacity to be presented to the jury. The majority's construction of the statute is entirely novel. It was advanced by neither the prosecutor who tried the case nor the deputy *463 attorney general who argued the matter before us.[1] In my view, the majority misconceives the legislative design and sets an unwholesome and dangerous precedent by impermissibly shifting the burden of proof and emasculating the constitutional right to a jury trial. I dissent.
My views are fully expressed in State v. Humanik, 199 N.J. Super. 283 (App.Div. 1985), certif. den. 101 N.J. 266 (1985) and need not be exhaustively recounted here. Suffice it to say, I read the statute as requiring the defendant to rebut the assumption of mental normalcy by a preponderance of the evidence while imposing upon the prosecution the burden of establishing the requisite state of criminal culpability beyond a reasonable doubt. The statute permits the defendant to introduce evidence of mental disease or defect to show that he did not harbor the culpability state required for murder. Under N.J.S.A. 2C:4-2, the defense is obliged to prove the existence of a mental disease or defect by a preponderance of the evidence. However, the State bears the ultimate burden of proving beyond a reasonable doubt that, whether defendant was sick or not, he nevertheless acted with the mens rea required for a conviction. That interpretation best comports with the statutory language and the legislative history.
By its very terms, the statute shifts the burden of proof to the defendant only with respect to the question of whether he had a mental disease or defect. N.J.S.A. 2C:4-2 says no more than that the accused shall bear the burden of establishing that he had a mental disease or defect by a preponderance of the evidence. It does not impose upon the defendant the obligation to prove that this disease or defect prevented him from acting with the requisite state of criminal culpability.
It is not unjust to place upon the accused the burden of proving mental disease or defect. Because psychiatric evaluation *464 as to subtle gradations of mental impairment is highly subjective, the State may in fairness require a defendant to convince the jury that he suffered from a mental disease or defect when the crime was committed. The State must ultimately establish, however, that defendant did in fact harbor the mens rea necessary for a conviction. This is a constitutional obligation which cannot be shifted to the accused. Hence, the legislative design was merely to require the defendant to convince the jury by a preponderance of the evidence that he had a mental disease or defect at the time the crime was committed. Nevertheless, under the statute, the State bears the burden of establishing that defendant acted either purposely or knowingly when he killed the victim.
The chronology of legislative action pertaining to N.J.S.A. 2C:4-2 is highly revealing. Specifically, the amendatory language shifting the burden of proof to the defendant with respect to "mental disease or defect" came upon the heels of our Supreme Court's opinion in State v. Molnar, 81 N.J. 475 (1980). In Molnar, the Court held that it is constitutionally permissible to require the defense to prove amnesia so long as the prosecution bears the ultimate burden of establishing the requisite state of criminal culpability beyond a reasonable doubt. Id. at 490-491. Senate Bill 1537 (1980), which contained the amendatory language, was introduced eight months after the Court's decision in Molnar was rendered. While the accompanying statement of the Senate Judiciary Committee did not refer to the Molnar decision by name, it is more than coincidence that amnesia was considered as an example of the "type of mental disease or defect ... which must be proved by the defendant by a preponderance of the evidence." Statement to Senate Committee Substitute for Senate Bill 1537 (1981). In my view, the amendment to N.J.S.A. 2C:4-2 was merely designed to codify our Supreme Court's decision in Molnar.
I perceive nothing in the legislative history or the statutory language which suggests that the Legislature intended to impose upon the defendant the burden of disproving what is *465 clearly an element of the offense. Nor do I discern anything in the Code of Criminal Justice supporting the majority's attenuated construction of the statute. Indeed, the opposite is true. N.J.S.A. 2C:1-13a specifically states that "[n]o person may be convicted of an offense unless each element of [the crime] is proved beyond a reasonable doubt." Embraced within the phrase "element of an offense" are ultimate facts which "[negative] an excuse or justification for [the defendant's] conduct." N.J.S.A. 2C:1-14h(3)(c). "In the absence of such proof, the innocence of the defendant is assumed." N.J.S.A. 2C:1-13a. Only where a fact does not constitute an element of the offense may the burden be shifted to the defendant and the issue decided by the judge and not the jury. N.J.S.A. 2C:13d(1) and (2).
There is simply no support for the majority's thesis that the Legislature envisioned a mini-trial within a trial to test the persuasiveness of evidence of the defense of diminished capacity proffered by the accused. Wholly apart from the obvious impracticality of such an approach, my research discloses nothing in our case law which permits it. Only recently, our Supreme Court had occasion to observe that "[a] defendant in a criminal case is entitled to have the jury consider any legally recognized defense theory which has some foundation in the evidence, however tenuous.... Very slight evidence on a theory of defense will justify the giving of an instruction." State v. Powell, 84 N.J. 305, 317 (1980) quoting People v. Dortch, 20 Ill. App.3d 911, 314 N.E.2d 324, 325-326 (App.Ct. 1974). "[A]ll that needs to be shown is the slightest amount of evidence regarding the underlying theory...." State v. Powell, supra, 84 N.J. at 316, n. 12 quoting People v. Hall, 25 Ill. App.3d 992, 324 N.E.2d 50 (App.Ct. 1975). Cf. State v. Rockholt, 96 N.J. 570, 581 (1984); State v. Toscano, 74 N.J. 421, 442 (1977); State v. Talbot, 71 N.J. 160, 165 (1976); State v. Vigliano, 43 N.J. 44, 65-66 (1964). This same principle is applied in other jurisdictions. See United States v. Brawner, 471 F.2d 969, 1001-1002 (D.C. Cir.1972); United States v. *466 Grimes, 413 F.2d 1376, 1378 (7 Cir.1969); United States v. Phillips, 217 F.2d 435, 440 (7 Cir.1954); Tatum v. United States, 190 F.2d 612, 617 (D.C. Cir.1951), aff'd 249 F.2d 129 (D.C. Cir.1957); People v. Matter, 371 Ill. 333, 20 N.E.2d 600, 602 (Sup.Ct. 1939); People v. Kucala, 7 Ill. App.3d 1029, 288 N.E.2d 622, 626 (App.Ct. 1972). Had the Legislature intended to deviate from this well-recognized rule, it would have said so.
This brings me to the most disturbing aspect of the majority opinion. Under that interpretation of N.J.S.A. 2C:4-2, it is incumbent upon the defendant to establish the defense of diminished capacity by a preponderance of the evidence. If the majority is correct, the defendant now bears the burden of disproving what is clearly an element of the offense, i.e. that he purposely or knowingly killed the victim. If, as the majority claims, that is what the Legislature intended, my answer is that the amendment is violative of due process and contravenes common notions of fairness.[2]
As I pointed out in State v. Humanik, supra, 199 N.J. Super. at 291 "[t]he State's obligation to prove the guilt of the accused beyond a reasonable doubt had its genesis in the common law of England and is constitutionally compelled." See also Mullaney v. Wilbur, 421 U.S. 684, 685, 95 S.Ct. 1881, 1883, 44 L.Ed.2d 508, 511 (1975); In re Winship, 397 U.S. 358, 361, 90 S.Ct. 1068, 1071, 25 L.Ed.2d 368, 373-374 (1970); State v. Grunow, 102 N.J. 133, 144-145 (1986). The requirement that a defendant be presumed innocent until proven guilty beyond a reasonable doubt "has a status in our criminal law of primordial origin." State v. Ingenito, 87 N.J. 204, 213 (1981). Although not expressly articulated in the Constitution, the presumption constitutes a fundamental principle long embraced in our organic *467 law. It has been said that the requirement is "bottomed on a fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free." In re Winship, supra, 397 U.S. at 372, 90 S.Ct. at 1077, 25 L.Ed.2d at 380 (Harlan, J., concurring). "No one currently disputes the settled principle that the State bears the burden of proving beyond a reasonable doubt each element of the offense charged including the requisite mental state." State v. Humanik, supra, 199 N.J. Super. at 291-292. As to this element, the rule is derived from the common law concept that criminal sanctions will not be imposed upon a defendant unless there exists a "concurrence of an evil-meaning mind with an evil-doing hand...." State v. Williams, 29 N.J. 27, 41 (1959) quoting Morissette v. United States, 342 U.S. 246, 251, 72 S.Ct. 240, 244, 96 L.Ed. 288, 294 (1952).
The majority's construction of the statute unconstitutionally shifts the burden of proof to the defendant and thereby intrudes upon this fundamental principle. It is no less constitutionally offensive merely because it returns the burden of proof to the State once the judge is satisfied that the defense has been established by a preponderance of the evidence. Indeed, it is significant that the question is not submitted to the jury unless the defense is first proved to the satisfaction of the judge. This merely compounds the constitutional error. While the presumption of innocence is generally considered to have its etiology in the concept of due process, Taylor v. Kentucky, 436 U.S. 478, 485-486, 98 S.Ct. 1930, 1935, 56 L.Ed.2d 468, 475 (1978), its strictures are closely "intertwined with the substantive right of trial by jury itself." State v. Ingenito, supra, 87 N.J. at 214. See also State v. Humphreys, 54 N.J. 406, 416 (1969). That right has been described as perhaps the "most cherished" in the long history of our Anglo-American jurisprudence, having existed since at least the Magna Charta and beyond. State v. Ingenito, supra, 87 N.J. at 210. "Many strands are interwoven to make up the composite guarantee which constitutes the right to trial by jury in a criminal case." *468 Id. at 211. In that respect, one major facet "inheres in the nondelegable and nonremovable responsibility of the jury to decide the facts." Id. at 211. It is axiomatic that while it is the judge's province to decide the law, "it is the jury, and the jury alone, that determines the facts." Ibid. The jury's fact-finding function is "all-inclusive and encompasses the evaluation of the credibility of witnesses and the weight and worth of evidence." Ibid.
The amendment, as construed by the majority, violates that fundamental principle. In many cases, as here, it would prevent highly relevant and valuable information from being presented to the jury. The jury's fact-finding role would be severely impaired because the half-truths presented to it would often be far more misleading than a total distortion.
The majority's construction of the amendment arrogates to the judge a function historically assigned to the jury. The unstated thesis underlying this interpretation is that juries are often unable to properly evaluate complex psychiatric testimony. I fully recognize the lingering suspicion harbored by many with respect to the defense of diminished capacity. State v. Humanik, supra, 199 N.J. Super. at 298. Such a defense, dependent on the vagaries of human perception and our inexact knowledge of mental illness, can easily be contrived and fabricated. It is not uncommon for judges and lawyers to exchange tales of what they perceive as erroneous decisions by errant juries. The defenses of insanity and diminished capacity offer a particularly fertile field for such errors.
Ultimately, we come to an old topic  one upon which reasonable persons often differ  the ability of the jury to perceive the truth. It has been said that courts "are ambivalent in their estimate of the intelligence of the layman, summoning one line of cases and then another to support the varying moods of their decisions." State v. Hawthorne, 49 N.J. 130, 147 (1967) (Weintraub, C.J., concurring). To some, resolution of that question depends upon "whether one views the jury as composed of *469 twelve [persons] of average intelligence or twelve [persons] of average ignorance." Note, 35 Brooklyn L.Rev. 139, 140 (1968). It is important to note, however, that human error does not stop at the jury rail. Judges err too. And finally, it bears emphasis that our citizens generally prefer to have their fates determined by twelve fools rather than one.
I would reverse. The judge erroneously precluded the jury from considering a defense that was founded upon the evidence presented. Therefore, I am constrained to dissent.
NOTES
[1] On appeal, the State contends that the trial judge's failure to instruct the jury with respect to the defense of diminished capacity was harmless error.
[2] It is axiomatic that when a statute is capable of two constructions, one of which will render it invalid and the other valid, the interpretation sustaining constitutionality must be adopted. State v. Profaci, 56 N.J. 346, 350 (1970); Ahto v. Weaver, 39 N.J. 418, 428 (1963); Clifton v. Passaic Cty. Bd. of Taxation, 28 N.J. 411, 422 (1958); In re Loch Arbour, 25 N.J. 258, 264-265 (1957).